LANCE A. ETCHEVERRY (SBN 199916)
Lance.Etcheverry@skadden.com
CAROLINE VAN NESS (SBN 281675)
Caroline.VanNess@skadden.com
OLIVIA L. VADEN (SBN 334405)
Olivia.Vaden@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, California 94301
Telephone:     (650) 470-4500
Facsimile:      (650) 470-4570

*Attorneys for Plaintiff*
CRESCENT POINT ENERGY CORP.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CRESCENT POINT ENERGY CORP., <br><br> Plaintiff, <br><br> v. <br><br> TACHYUS CORPORATION, <br><br> Defendant. | Case No.: 3:20-CV-06850-MMC <br><br> FIRST AMENDED COMPLAINT FOR: <br> (1) FRAUD IN THE INDUCEMENT; <br> (2) BREACH OF WRITTEN CONTRACT; <br> (3) BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; <br> (4) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200); and <br> (5) UNJUST ENRICHMENT. <br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Crescent Point Energy Corp. ("Crescent Point"), for its First Amended Complaint against Defendant Tachyus Corporation ("Tachyus"), alleges based on its own personal knowledge and on information and belief as follows:

## INTRODUCTION

1.      This case is brought by Crescent Point, a leading North American oil producer that focuses on sustainable development of oil and gas assets in Western Canada, and arises out of the fraudulent misrepresentations made by Defendant Tachyus regarding the development and efficacy of its "Data Physics" Software-as-a-Service ("SaaS") solution.  Desperate to extend its geographic reach, engage its first Canadian client (and first client  to use Tachyus's software on tight oil reservoirs), and obtain access to valuable data from such tight oil reservoirs to improve its software, Tachyus knowingly misrepresented the capabilities of its company and software to Crescent Point. After months of substantial investments by Crescent Point, it became clear that Tachyus's act was just a ruse, intentionally devised to deceive Crescent Point for Tachyus's sole benefit.  All told, Tachyus falsely promised Crescent Point up to $120 million in financial upside, which Tachyus knew could never materialize.

2.      Crescent Point is unique among oil producers.  Unlike most producers, Crescent Point's oil fields feature "unconventional" light oil found in tight reservoirs that have unique geological characteristics and development strategies, and use special tools and drilling processes (*i.e.*, horizontal drilling) to access the oil reservoirs below the Earth's surface ("unconventional plays").  In contrast to the "conventional" oil reservoirs (or "conventional plays") that one might find in California, where Tachyus's handful of then-existing customers had operations, Crescent Point's unconventional plays are comprised of layers of shale that inhibit access to the tight oil reservoir found in the subsurface hydrocarbon rich formations.

3.      Whereas conventional oil fields are akin to a sponge, replete with openings where oil can permeate out of the reservoir, Crescent Point's reservoirs are like wooden tables – less-permeable formations that do not allow for easy oil extraction.  As such, the only way to access the hydrocarbons within a tight oil reservoir is by cracking holes in the formation to create openings (*i.e.*, "fracking") for fluids such as water to then enter the reservoir.  Once oil extraction equipment, such as casing, is

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT          CASE NO. 3:20-CV-06850

1    put in place, the operators pump water throughout the fractured casing to flood the oil out of the
2    reservoir and bring it to the surface, *i.e.*, "waterflooding." This technique is not done in California,
3    and prior to engaging Crescent Point, Tachyus had never worked with tight oil reservoirs such as
4    Crescent Point's.

5        4.    Essentially, Crescent Point was Tachyus's white whale. Tachyus realized that
6    Crescent Point would be the perfect – and likely *only* – candidate for its fraud, as securing a deal
7    with Crescent Point would allow Tachyus to expand its business into Canada and give Tachyus
8    access to data from a completely different operating environment than any oil field it had ever worked
9    on. Access to such data would then allow Tachyus to develop its software for use with
10   unconventional reservoirs, like Crescent Point's, and to make its software offerings stronger for
11   future customers, all at zero benefit to Crescent Point.

12       5.    Indeed, counting Crescent Point among its clients and obtaining its data was so
13   important to Tachyus's executives that they went so far as to promise Crescent Point a "risk free"
14   engagement, with full knowledge that Crescent Point would actually bear all the risk, due to
15   Tachyus's inexperience and not-yet-capable software. That is, Tachyus falsely guaranteed that
16   Crescent Point would owe nothing until there were proven results from Tachyus's software suite.

17       6.    To induce Crescent Point into the contract, Tachyus made numerous
18   misrepresentations, representing its software as more technologically advanced than it really was at
19   the time. While asserting that it had a "proven track record" of optimizing waterflood operations, in
20   reality, all Tachyus had was an under-developed software model (still in beta testing) that it tried to
21   peddle to Crescent Point to gain access to Crescent Point's tight reservoir data, production data,
22   horizontal well data and fracture stimulating data. Crescent Point was wholly unaware of this fact at
23   the time. Moreover, Tachyus represented to Crescent Point that its "track record" reflected
24   operational successes that were directly applicable and analogous to Crescent Point's needs. This
25   too was false, as Tachyus had never deployed its software with a client that had the volume and
26   complexity of Crescent Point's reservoirs.

27       7.    Tachyus cannot claim that it did not know its software would be incompatible with
28   Crescent Point's wells. During the Parties' pre-contractual negotiations, Crescent Point made it

known to Tachyus executives, including Jeff McNamara and Dakin Sloss, that Crescent Point was concerned about how Crescent Point's unique reservoirs and wells would hold up against Tachyus's software. Rather than disclose its lack of experience and the shortcomings of its not-yet-developed software, Tachyus falsely asserted time and again that its software's mathematical algorithms could accurately predict optimal waterflood pressure and that its engineers knew how to work with tight oil reservoirs. Contrary to these representations, Tachyus personnel knew that the company's software lacked the capability to process the type and nature of data that would come from Crescent Point's reservoir.

8.      In reliance on Tachyus's description of its product offering and repeated assurances that its software could – and would – produce reliable results for Crescent Point's waterflooding operations to improve and enhance oil extraction, Crescent Point signed a deal with Tachyus and made a significant internal investment of over $3 million to the project, diverting valuable resources from various projects to work on Tachyus's software (often without any help from the Tachyus team). In fact, Crescent Point dedicated multiple reservoir engineers to this effort, at the expense of their other work, and hundreds of IT staff hours to build an entirely new software platform for the sole purpose of collecting and transferring large amounts of its unique well and reservoir data to Tachyus.

9.      All told, during the 13 months that Tachyus pushed its software and continuously deceived Crescent Point with repeated lies about its software's capabilities and upside, Crescent Point spent significant money, time and resources to unknowingly help Tachyus "develop" software that Tachyus knew would *never* be suitable for Crescent Point's needs – but would be valuable for Tachyus in the future. In reliance on Tachyus's web of misrepresentations, Crescent Point likewise diverted resources away from its own well simulations, which, when conservatively calculated, has caused more than $60 million in harm to Crescent Point. Crescent Point never would have undertaken such actions were it not for Tachyus's misrepresentations about its product offering and the benefit it falsely claimed Crescent Point would reap.

10.     Not only did Tachyus know that its software, in its then-current state, would not produce any results for Crescent Point, Tachyus executives further represented that its software had

features that did not exist at the time, including the ability to i) use machine learning to quickly and efficiently create forecasts of oil production, including in under fifteen minutes; ii) incorporate and analyze fracking data; iii) run analytics against "sparse" data; and iv) handle forecasting on tight oil reservoirs with the number of wells that Crescent Point had.

11.    Despite a "risk free" agreement that guaranteed Crescent Point would not owe any money and would not be invoiced by Tachyus until Tachyus's software showed "feasible opportunities for meaningful financial upside" for Crescent Point – a level of success that *Tachyus knew had not been and would never be achieved* – Tachyus nonetheless invoiced Crescent Point on July 15, 2018 for $1,050,000.[1]  This invoice purportedly represented seven months of work, despite the fact that Tachyus: i) failed to do any actual software development work, and ii) instead exploited Crescent Point's team for its own ongoing beta-testing and development efforts, in violation of the Parties' Agreement.  On September 27, 2018, due to an internal administrative error, Crescent Point mistakenly paid this invoice.

12.    Notwithstanding Tachyus's misrepresentations about its product, and its utter failure to deliver any functional version of its software to Crescent Point, Tachyus has since refused to refund the erroneously paid invoice or to compensate Crescent Point for the significant harm that it has caused.  Crescent Point has been left with no choice but to seek judicial intervention to recover the money that it lost by virtue of Tachyus's willful misconduct.

## THE PARTIES

13.    Plaintiff CRESCENT POINT is a corporation formed under the laws of the Province of Alberta, Canada, with its head office located in Calgary, Alberta, Canada.

14.    Defendant TACHYUS is a corporation formed under the laws of the State of Delaware, with its headquarters located in Houston, Texas.  Tachyus is registered to carry on business in California, and has its principal California office in Berkeley, California.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

---

[1]    The value of Tachyus's July 15, 2018 invoice reflects Canadian dollars.

16.     This Court has personal jurisdiction over Tachyus because Tachyus is registered to carry on business in California and maintains its principal office in Berkeley, California.  Tachyus has appeared in this action and does not dispute that this Court has personal jurisdiction over it.

17.     This Court is the proper venue for this First Amended Complaint under 28 U.S.C. § 1391, as Tachyus is registered to do business in California and maintains a business office in Berkeley, California.

18.     In addition, jurisdiction and venue are proper in this Court because the United States District Court for the Northern District of California in San Francisco, California, has jurisdiction over this dispute according to the terms of the Parties' Master Subscription Agreement.  Section 10.10 of the Master Subscription Agreement contains a California choice-of-law provision and a mandatory forum selection clause requiring Crescent Point and Tachyus to bring any legal action or proceeding against each other arising out of or relating to the Parties' Agreement in either the state or federal courts located in San Francisco, California.

## **FACTUAL ALLEGATIONS**

I.     <u>TACHYUS WAS WILLING TO GO TO ANY LENGTHS TO SECURE CRESCENT POINT'S BUSINESS – EVEN FRAUD</u>

19.     Prior to September 2017, Tachyus was a small-scale corporation seeking to enter into the big leagues.  Tachyus's value proposition was that it could use mathematical algorithms based on oil reservoir data to predict and optimize oil extraction through its "Data Physics" software.  At this time, Tachyus had, at most, eight customers over its lifetime, all of whom were located in California, where oil reservoirs are typically porous, permeable, and companies utilize vertical well drills for oil extraction.

20.     In fact, as of September 2017, Tachyus had neither modeled nor developed its software for use on less-permeable tight oil reservoirs or for companies that use horizontal well drills, engage in fracking or use waterflooding to extract oil from tight reservoirs.  Tachyus knew that if it could build this capability, it could tap into a whole new lucrative market with high volume and sophisticated oil producers in entirely new regions.

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT        CASE NO. 3:20-CV-06850

21.     As such, the prospect of landing Crescent Point as a client was critical to Tachyus's business model, as it would be Tachyus's first Canadian-based client that utilized waterflooding operations in a market that Tachyus had not yet been able to penetrate.  Indeed, a contemporaneous press release announcing the onboarding of Jeff McNamara, then-Vice President of Tachyus North America, emphasized that he joined Tachyus "to aggressively expand" its customer base in Canada, demonstrating that breaking into this market was a top priority for Tachyus.

22.     Not only was Tachyus desperately seeking inroads into the Canadian oil and gas market, Tachyus was also looking for a company that could provide it with tight oil, unconventional play and fracking data, among other hard to find metrics that Crescent Point happened to possess. As such, Crescent Point was the perfect guinea pig for Tachyus's undisclosed software experiment.

23.     Rather than admit it lacked knowledge and experience in this new market, from September 2017 to January 2018, Tachyus – in pursuit of its wrongful endeavor to profit off of Crescent Point's tight oil and unconventional play data – schemed to pitch its software, gain Crescent Point's business and aggressively pursue Crescent Point as a client.  Tachyus engaged in this scheme while knowing that its software *would not work* for Crescent Point's intricate operations, as its software was not designed to handle complex information from reservoirs like Crescent Point's, and did not have many of the necessary capabilities to successfully fit and predict waterflooding operations for Crescent Point.

24.     Tachyus was further motivated to dupe Crescent Point based on its urgent need to boost its bottom line.  To that end, Jeff McNamara used "no holds barred" marketing tactics – repeatedly emailing, calling and meeting with Crescent Point employees – in an effort to gain Crescent Point's business.  Indeed, Tachyus's co-founder Dakin Sloss ("Sloss") emailed Crescent Point on October 18, 2017, reaffirming that Tachyus was "motivated to get started working" with Crescent Point, Tachyus's "first Canadian customer as soon as possible," and informing Crescent Point that Tachyus could "be aggressive in [its] discounts if a deal [was] signed before mid-November *given some of [Tachyus's] internal goals.*"

25.     Tachyus was so desperate to reach its goals, it even started bargaining on the terms of the Agreement itself, offering Crescent Point discounted rates to finalize the contract in 2017, despite

1    the fact that work under the Agreement would not start until January 2018, in an effort to get the deal

2    done as quickly as possible.

3        26.    Tachyus further conceded that timing was critically important, telling Crescent Point

4    that it was "making a push in Q4 and [was] motivated to get this deal done soon."  Because Tachyus

5    was still a small business that had not yet been able to penetrate the oil and gas industry, landing a

6    contract with an industry leader like Crescent Point would provide much-needed credibility with

7    future clients and in the Canadian region.  Additionally, Tachyus knew that the signal boost and

8    exposure to other oil producers in the region that it would gain by securing Crescent Point's business

9    was an invaluable asset that Tachyus needed to help boost its bottom line.[2]

10       27.    Thus, Tachyus pitched Crescent Point on having access to its custom software, which

11   it described as if Crescent Point were "renting the software" through executed licensing agreements

12   for use of the software.  The software, known as Data Physics and as described by Tachyus, would

13   be used by Crescent Point to optimize its waterflood operations in several of Crescent Point's largest

14   and most important oil fields.

15       28.    Tachyus was plainly aware that Crescent Point's wells and reservoirs are unique to

16   the region and produce data that cannot be obtained from other companies, as Crescent Point went

17   to great lengths to emphasize the intricacies of its operations and the nuance that would be required

18   for a data analytics tool like Tachyus's to be successful.  In fact, it took Tachyus months to secure

19   Crescent Point's business because Crescent Point was initially unsure whether Tachyus's software

20   would be compatible with Crescent Point's wells.  Tachyus executives, however, were able to

21   convince Crescent Point that its Data Physics software could fully fit and predict Crescent Point's

22   waterflooding operations in tight oil reservoirs by blatantly misrepresenting the development-stage

23   of its software and by making promises and assurances that Tachyus knew it could not keep.  (*See*

24   *infra* ¶¶ 29-60.)

25

26   _____
     [2]      Tachyus's motive was confirmed in a May 2018 press release announcing a partnership to
27   "strengthen its Canadian presence."  Tachyus referenced the signing of Crescent Point, as "clos[ing]
     multiple major customers internationally, including in Canada."  In the press release, Tachyus falsely
28   claimed that "[e]very partnership has produced at least a 200% ROI," which it knew could not be
     delivered with respect to Crescent Point.   https://www.tachyus.com/media/pm-stephen-harper-
     becomes-global-advisor-strengthens-canadian-presence.html

II.     DESPERATE TO OBTAIN CRESCENT POINT'S BUSINESS, TACHYUS
        MISREPRESENTED NUMEROUS OF ITS SOFTWARE'S "THEN-EXISTING"
        CAPABILITIES

29.     On January 12, 2018, Crescent Point and Tachyus executed the Parties' Agreement, comprising of a Statement of Work, a Master Subscription Agreement and an Addendum to the Master Subscription Agreement.  However, from as early as April 2017 until January 2018, just before the Agreement was executed, Tachyus, by and through its executives and employees, made numerous fraudulent misrepresentations about the analytics and "then-existing" capabilities of its Data Physics software, none of which were true.

30.     Specifically, Tachyus made the following false statements:

31.     **False Statement #1:** On November 16, 2017, Jeff McNamara ("McNamara") (Tachyus) sent Ryan Sinclair ("Sinclair") (Crescent Point) an email containing Tachyus's marketing document, "Case Study Executive Summary," that represented that Tachyus's software could use machine learning to quickly and efficiently create forecasts of oil production by predicting and optimizing the pressure with which Crescent Point conducted its waterflooding, the injection rates and speeds it used, and how Crescent Point could maximize oil extraction on its reservoirs.

32.     **Facts Supporting Falsity:** Contrary to Tachyus's misrepresentations, as of November 16, 2017, Tachyus and McNamara knew its software lacked the capability to use machine learning to quickly and efficiently create forecasts of oil production; nor could it predict and optimize the pressure with which Crescent Point should have conducted its waterflooding, the injection rates and speeds Crescent Point should have used, or how Crescent Point could maximize oil extraction on its reservoirs.  Tachyus's software lacked this capability because, as of November 16, 2017, its Data Physics software was still undergoing beta testing and had not developed these features – in direct contrast to the clear representations made by McNamara.  As such, the Data Physics software did not have sufficient algorithms or the necessary software capabilities to optimize the pressure with which Crescent Point should have been conducting waterflooding, the injection rates and speeds Crescent Point should have been using, and otherwise lacked any ability to maximize oil extraction. Tachyus and McNamara also knew that, at the time, the Data Physics software lacked the ability to optimize any of Crescent Point's waterflooding operations because it had not been programmed for

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT        CASE NO. 3:20-CV-06850

1  use with Crescent Point's unique reservoir characteristics.  Indeed, the falsity of Tachyus's

2  representations became clear as soon as Tachyus and Crescent Point started executing the

3  Backtesting Phase, as it was evident that Tachyus's software would never work to optimize Crescent

4  Point's waterflooding operations in any calculable capacity.  In fact, it took the Parties longer than

5  the entirety of the projected Backtesting Phase, which was approximately four months, just to attempt

6  to transfer Crescent Point's data to Tachyus, let alone begin any sort of backtesting or software

7  modeling whatsoever.

8      33.    **False Statement #2:** On November 16, 2017, McNamara emailed Sinclair Tachyus's

9  "Case Study Executive Summary," which guaranteed that Tachyus's software could complete

10  fieldwide 15-year, 1,000 well forecasts for Crescent Point in less than fifteen minutes.

11      34.    **Facts Supporting Falsity:** As of November 16, 2017, Tachyus and McNamara knew

12  that the software could not complete fieldwide 15-year, 1,000 well forecasts for Crescent Point in

13  under fifteen minutes, as the software had never been used in connection with horizontal well drills

14  and, therefore, lacked the capacity to deliver on the company's guarantee.  Indeed, Tachyus and

15  McNamara knew at the time that any prior uses of Tachyus's software on vertical well drills was

16  wholly inapplicable to the prospective use with Crescent Point, such that Tachyus and McNamara

17  indisputably knew that its software could not complete a 1,000 well forecast incorporating fifteen

18  years' worth of data in fifteen minutes.  Additionally, Tachyus knew that its software was not yet

19  sophisticated enough to gather or analyze the additional categories of data that horizontal well drills

20  provide.  Tachyus further knew that these additional categories of data would tax its software's then-

21  existing forecasting ability, likely *increasing* the time it took to generate a forecast and rendering it

22  impossible to generate projections in such a short period of time.  Again, the falsity of this

23  representation, and the shortcomings of the Tachyus software, became clear once work had begun

24  on the executed Agreement.

25      35.    **False Statement #3:** On November 16, 2017 McNamara emailed Sinclair Tachyus's

26  "Case Study Executive Summary," which stated that the "fundamental advantage of the Tachyus

27  technology is the speed at which engineers can create forecasts using Data Physics' patent-pending,

28

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT        CASE NO. 3:20-CV-06850

1  modeling technology," promising that its model "require[s] only days to set up" and "offer[s] long-
2  term predictive capacity even when historical data is sparse or missing."

3      36.    **Facts Supporting Falsity:** As of November 16, 2017, Tachyus and McNamara knew
4  that Tachyus's software could not offer Crescent Point "long-term predictive capacity even when
5  historical data is sparse or missing," nor could its software be set up in mere days.  Tachyus and
6  McNamara were aware that Crescent Point's well count and volume of historical data far exceeded
7  any prior customers' volumes on either front.  Tachyus and McNamara also knew that the software
8  (and Tachyus's data receiving platform) was not equipped to process such large amounts of data
9  from vast numbers of wells in just days.  Indeed, it took the Parties *over four months* – longer than
10 the entirety of the promised Backtesting Phase – just to get Crescent Point's data transferred to
11 Tachyus, because Tachyus's software lacked the ability to receive Crescent Point's data and its
12 engineers were unable to interpret the data as they received it from Crescent Point.  Also, at that time,
13 Tachyus's software had only been used to forecast highly permeable oil reservoirs with vertical well
14 data, an entirely different scenario than Crescent Point's operations.  What is more, Tachyus later
15 admitted that its software would not work with "sparse" data, telling Crescent Point engineers that
16 the reason Tachyus's software was failing was due to a lack of data.  Further, Tachyus had only
17 worked with, at most, eight customers on a small number of "conventional" wells in California, with
18 only around 10,000 wells total.  For contrast, Crescent Point's single contract with Tachyus was for
19 Data Physics software testing on over 6,000 wells – more than 50% the amount of wells Tachyus's
20 software had modeled in its lifetime.  Because Tachyus knew that its software did not have any
21 workable capabilities necessary for Crescent Point's wells, and had never worked on a project of
22 similar scope to Crescent Point's oil fields, Tachyus knew that the representations it made regarding
23 its software's capabilities were false.

24      37.    **False Statement #4:** From on or June 2017, McNamara told Sinclair and other
25 Crescent Point employees that Tachyus's software was capable of analyzing fracking data for
26 Crescent Point as part of its model.  Indeed, on June 15, 2017, Tachyus's Principal Geologist Mark
27 Henning ("Henning") exchanged correspondence with Crescent Point, in which he requested that
28 Crescent Point fill out an "asset details" spreadsheet that he prepared to start understanding the

1   makeup and characteristics of Crescent Point's wells.  In this "asset details" spreadsheet, he

2   specifically asked for Crescent Point to provide him with information on Crescent Point's "reservoir

3   challenges" and "operational challenges," seeking to understand the unique properties of

4   Crescent Point's wells, including information and data about Crescent Point's fracking

5   operations.  Sinclair (on behalf of Crescent Point), replied to Henning with the information he had

6   requested, informing Henning (and thereby Tachyus) that Crescent Point's oil fields contain "tight

7   oil reservoirs," "tight rock," and "natural fractures, folds and faults."  Henning responded,

8   confirming that such assets would be included "in an initial scope of work proposal," holding

9   Tachyus out as being able to assess such data.

10      38.    **Facts Supporting Falsity:** Tachyus knew its software could not incorporate fracking

11  data into its model from the very start, including on June 15, 2017 when Henning held Tachyus out

12  to Crescent Point as being capable of doing so.  Tachyus knew its software lacked this capability

13  because it had not even tried to build in such a feature as of that date.  On August 7, 2018, Tachyus

14  unwittingly admitted that it had blatantly lied about its software's ability to accommodate fracking

15  information.  Specifically, in an August 7, 2018 email, Garrett Fowler confirmed to Crescent Point

16  engineers Ryan Sinclair, Kerry Sandhu and Rous Dieva, that Tachyus's software's "fracture closure

17  parameter" had only been "recently" added.  Put differently, Tachyus had not even attempted to build

18  in this capability at the time it told Crescent Point it could do so.

19      Pallav has continued to tinker, and most recently has added a 'fracture closure' parameter. This

20      parameter allows near well permeability to degrade overtime, which can more closely approximate
        actual behavior. Attached is an image of this, and we will be pushing to web-app next week (I believe).

21      The user can set the new parameter to 0 and the model will behave as previous, or can adjust values to
        get behavior similar to screenshot.

22

23      39.    **False Statement # 5:** On November 16, 2017, McNamara sent Sinclair Tachyus's

24  "Case Study Executive Summary," which stated that Tachyus's Data Physics software, when fed

25  with a large sample set of data, would learn how to match previous historical data and then forecast

26  future production based on optimized operating conditions by deploying its "closed-loop system."

27  The "Case Study Executive Summary" described Tachyus's closed-loop system as an automatic,

28  self-sufficient optimizer and predictor that can develop suggestive and informative waterflooding

1  operations with little historical data and validate predictive capacity by continuously "ingest[ing]

2  new data [such that] the updated models optimize reservoir management decisions such as injectant

3  redistribution, in real time throughout the life of the [oil] field."

4       40.  **Facts Supporting Falsity:** As of November 16, 2017, Tachyus and its executives,

5  including McNamara, knew that Tachyus could not credibly make the promises that it did.  Crescent

6  Point made it clear from the outset of the Parties' discussions that the company drills wells that enter

7  oil reservoirs horizontally, each 200 meters apart, in order to frack the shale layer inhibiting access

8  to the tight oil reservoir.  Tachyus was aware that this process vastly differs from the vertical well

9  drill scenarios its software model was built on, which rely on the pressure response metric that is

10  learned by measuring flood pressure and response across wells to re-distribute resources where they

11  are needed to extract more oil.  Despite knowing that Crescent Point's horizontal wells and tight oil

12  reservoirs provide a more complex scenario than the simpler vertical wells Tachyus had worked on

13  before, McNamara assured Crescent Point that Tachyus's closed-loop system would be able to

14  optimize Crescent Point's waterflooding operations, a claim Tachyus knew lacked any basis in fact.

15  Put simply, Tachyus had never so much as attempted to model its software on tight reservoirs or

16  horizontal wells by September 2017.  As such, Tachyus executives like McNamara had no basis to

17  claim Tachyus's "closed-loop system" would perform on Crescent Point's wells, and knew such

18  representation to be false.

19  III.  TACHYUS MADE NUMEROUS MISREPRESENTATIONS ABOUT THE TIME IT
     WOULD TAKE FOR ITS SOFTWARE TO BECOME OPERATIONAL AND THE
20       DEMANDS FOR TACHYUS'S RESOURCES

21       41.  From in or around April 2017 to January 2018, Tachyus further misrepresented the

22  amount of time and effort it would take Crescent Point to make Tachyus's software operational on

23  Crescent Point's wells, falsely telling Crescent Point that it would take minimal time and effort to

24  set up Tachyus's software.

25       42.  Specifically, Tachyus, by and through its executives and employees, knowingly made

26  the following misrepresentations:

27       43.  **False Statement #6:** On November 16, 2017, McNamara emailed Sinclair Tachyus's

28  "Case Study Executive Summary," which represented that Tachyus's software required very little

1   customer intervention in order to work successfully, and that even during the more intensive setup

2   phase of the software development process, customers only needed to provide "as little as 3 man

3   hours/week" to get the software up and running.

4       44.    **Facts Supporting Falsity:** Tachyus and McNamara knew well before November 16,

5   2017 that Tachyus's software could not be set  up by using only 3 man hours per week.  Rather,

6   Tachyus and McNamara knew that Crescent Point's required customer investment would always

7   exceed 3 man hours per week given Tachyus's platform's inability to receive and process Crescent

8   Point's data.  Tachyus and McNamara further knew that Tachyus had no basis for claiming that its

9   software could feasibly be set up with less than 3 man hours per week on Crescent Point's side, given

10  that Tachyus had never worked on a tight oil reservoir, let alone any reservoir with Crescent Point's

11  well count and volume of data.  Further, Tachyus's software was still undergoing beta testing,

12  receiving new features and upgrades, making it impossible for Tachyus to have known an accurate

13  set up time as of November 2017.

14      45.    **False Statement #7:** On November 16, 2017, McNamara sent Sinclair Tachyus's

15  "Case Study Executive Summary," which matched Tachyus's other promises and overall messaging

16  by representing that its Data Physics software allowed for "rapid adoption with minimal time and IT

17  investment" by the customer.

18      46.    **Facts Supporting Falsity:** Tachyus and McNamara knew that Tachyus's

19  misrepresentation about its Data Physics software requiring "minimal time and IT investment" was

20  false on November 16, 2017.  At the time McNamara made this misrepresentation to Sinclair,

21  Tachyus was still in the beta testing phase of its product development process and did not have a

22  workable product on which to base this claim.  Tachyus also was well aware that, due to the nature

23  and configuration of Crescent Point's tight oil reservoirs, its waterflooding scenarios were complex,

24  producing and collecting vast amounts of data such that transmitting and uploading this data onto

25  Tachyus's new and still beta tested software could cause the software to crash.  Given the complexity

26  of Crescent Point's reservoirs and Tachyus's underdeveloped software model, Tachyus and

27  McNamara knew that Crescent Point would need more than "minimal time and IT investment", and

28  that Crescent Point would need to invest substantial amounts of its own labor and resources to try to

1   bring Tachyus's software up to a level that could potentially be used for complicated

2   "unconventional" reservoirs.

3       47.     **False Statement #8:** On May 26, 2017, McNamara, as further inducement, promised

4   Crescent Point that "the backtest really is a risk free exercise for CPG [Crescent Point] in that if

5   [Tachyus was] not able to define optimization opportunities [it would] not proceed."  Again, on

6   October 19, 2017, McNamara offered Sinclair that same "risk free" agreement.  Under McNamara's

7   and Tachyus's "risk free," "walk away" guarantee, Crescent Point would not be required to pay

8   Tachyus for any fees incurred until Tachyus's Data Physics software provided Crescent Point

9   "feasible opportunities for meaningful financial upside."  As McNamara stated in an October 19,

10  2017 email to Sinclair, "[i]f for some reason there are NOT sufficient opportunities to create value,

11  we [Tachyus] will walk away.  This is why we term this 'risk free'" (emphasis in original):

12
          -   As discussed in the SOW we sent you, the contract is 2 year is total length. It is broken into 2
              parts.

13
              o   First (~~2-4 months) is the Backtest/Setup period. In the Backtest/Setup period we
                  will onboard all of your data for the different fields we have selected. (We still have
14                some work to do here I believe to single out the exact fields) During this time we work
                  with your engineers on how to build the fits and predictions along with the optimization.

15                ■  At the end of this Backtest/Setup period we will have a very good idea on what
                     the value creation will be. Assuming there are sufficient optimization
16                   opportunities we move into the second phase, the SaaS phase. If for some
                     reason there are NOT sufficient opportunities to create value, we will walk away.
17                   This is why we term this "risk free".

                  ■  During the Backtest phase there are no payments due by CPG. At the end of
18                   the Backtest, assuming it demonstrates the engagement will be successful, the
                     previous monthly payments are due and the regular payment terms kick in.

19            o   Second (~~4-24 months) we are in the SaaS phase and implementing changes in the
                  field and measuring results.

20      48.     **Facts Supporting Falsity:** Tachyus and McNamara knew by October 19, 2017 that

21  an Agreement with Crescent Point would be anything but "risk free."  Tachyus executives such as

22  McNamara were highly motivated to say whatever was necessary to secure Crescent Point's business

23  in the 2017 fiscal year in order to both boost Tachyus's bottom line and expand its business into

24  Canada, a company-wide pursuit that Tachyus would stop at nothing to achieve.  This economic

25  motive, coupled with the fact that Tachyus executives like McNamara knew that Tachyus's software

26  was in its infancy and still undergoing development, and the novelty and complexity of Crescent

27  Point's data set and waterflooding operations, made it impossible for an engagement with Tachyus

28  to ever generate value at no risk to Crescent Point.  In fact, Tachyus knew at the time that it would

1  need substantial assistance from Crescent Point's engineers and IT team to help develop a software

2  that could potentially be applied to a complicated oil reservoir like Crescent Point's.  And, when

3  predictably, the Tachyus software would fail to create any value for Crescent Point, it would be a

4  win-win situation for Tachyus: it would have had the opportunity to learn from Crescent Point's top-

5  flight engineering and IT team, and it would have had access to Crescent Point's invaluable oil field

6  information (which could be used to try to develop its software for future use with complicated oil

7  operations).  And, as an added bonus, Tachyus would subsidize this operation by improperly

8  charging Crescent Point for its time.  As McNamara well knew, it was a "risk free" engagement for

9  Tachyus, but not for Crescent Point.

10  IV.    TACHYUS MISREPRESENTED ITS ABILITY TO INGEST AND ANALYZE
        CRESCENT POINT'S UNIQUE RESERVOIR DATA
11

12      49.    Beginning in or around April 2017, and lasting through January 2018, Tachyus

13  repeatedly assured Crescent Point that its software could handle Crescent Point's unique reservoir

14  and well data, despite knowing such representations were false:

15      50.    **False Statement #9:** On April 25, 2017, McNamara emailed  Sinclair and Rob

16  Fiorentino ("Fiorentino") (Crescent Point), claiming that Tachyus's Data Physics software could

17  "automatic[ally] incorporate[e] log data" into the software to enhance "multi-objective optimization

18  techniques[.]"

19      51.    **Facts Supporting Falsity:** As of April 25, 2017, Tachyus and McNamara knew that

20  Tachyus's software could not handle the significantly higher volume of data that tight reservoirs like

21  Crescent Point's produce, and that it could not incorporate Crescent Point's data into its software

22  model.  As such, the data transfer process proved to be anything but "easy," and Tachyus's software

23  failed to even store, let alone incorporate or model, any results based on Crescent Point's data.

24  Tachyus and McNamara were aware that Tachyus's software had never been used on tight oil

25  reservoirs before, and knew it could not say how the influx of data would work with the Data Physics

26  software.  In fact, Tachyus was so overwhelmed by the data transfer alone (let alone any analysis of

27  the data) that Crescent Point had to deploy its own IT specialist to develop a completely new data

28  transfer system (spending hundreds of hours creating this program, uploading data and repackaging

1  data in a way that worked with Tachyus's software model).  Put simply, Tachyus knew that it had no

2  credible basis to assure Crescent Point that it could handle its data transfer with ease.

3  V.    TACHYUS MADE REPEATED FALSE PROMISES THAT ITS SOFTWARE WOULD
       BRING CRESCENT POINT MILLIONS OF DOLLARS OF INCREASED REVENUE

4

5         52.    While pitching Crescent Point's business from in or around April 2017 to January

6  2018, Tachyus repeatedly made promises about its software's ability to increase its customers'

7  revenues by staggeringly high amounts, a fact which Tachyus knew was vastly overstated at the time

8  as it related to Crescent Point.

9         53.    Specifically, Tachyus made the following misrepresentations about its software's

10  financial upside:

11         54.    **False Statement #10:** On November 16, 2017, McNamara sent Sinclair Tachyus's

12  "Case Study Executive Summary," which claimed that Tachyus's Data Physics software enabled

13  engineers to beat their baseline forecasts by ~30% and their best case by ~20%.

14         55.    **Facts Supporting Falsity:** Tachyus and McNamara knew by November 16, 2017

15  that Tachyus's software would never provide such dramatically positive results for Crescent Point.

16  Tachyus had only worked with eight California-based customers prior to pursuing Crescent Point,

17  none of which had produced oil from tight reservoirs, fracked, or used horizontal well drills.  Instead,

18  Tachyus's prior customers all had high permeability oil reservoirs that required no fracking and used

19  vertical well drills to extract oil.  By drawing its basis of comparison to "conventional" wells and

20  reservoirs, which is a completely different species from Crescent Point's "unconventional" wells and

21  tight oil reservoirs, Tachyus was able to make its software seem more effective and powerful than it

22  really was.  In reality, the software had *never been modeled on tight oil reservoirs*, and thus Tachyus

23  and McNamara could not have known whether and how the software would perform.  In fact,

24  Tachyus even admitted, in a November 16, 2018 email from Tachyus employee Delon Saks ("Saks"),

25  that Tachyus's software, as of November 16, 2018, did not "explicitly model hydraulic fractures in

26  horizontal wells," despite Tachyus's claims that its software could handle, and had experience in

27  modeling, fractured systems.

28

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT        CASE NO. 3:20-CV-06850

56.    **False Statement #11:** On November 16, 2017, McNamara emailed Sinclair Tachyus's "Case Study Executive Summary," which claimed that Tachyus's Data Physics software could increase its customers' revenue by as much as $60 million per reservoir that deployed the software, and help increase and enhance customers' overall oil production.

57.    **Facts Supporting Falsity:** Tachyus and McNamara knew that Tachyus's representations about potential financial upside to Crescent Point were not only false, but that Tachyus had no basis to make such representations about Crescent Point's economic gains as of November 16, 2017.  Tachyus had only worked with eight California-based customers prior to pursuing Crescent Point, none of which had production from tight reservoirs, engaged in fracking, or used horizontal well drills.  Further, Tachyus had only tested its software eight times before, and had no idea how its software would be able to improve revenue on more complex, larger-scale drilling and production operations like Crescent Point's.  Simply put, Tachyus and McNamara were out of their depths with respect to Crescent Point's operations, and had no basis to claim whether or how well its software would work on Crescent Point's wells and reservoirs.

58.    **False Statement #12:** On October 18, 2017, Tachyus's co-founder Sloss represented in an email to Ryan Girtzfeldt ("Gritzfeldt") (Crescent Point) that he was "confident that using Tachyus at CPG [Crescent Point]" would "unlock significant production increases and cost reductions in [Crescent Point's] water floods."

59.    **Facts Supporting Falsity:** On or before October 18, 2017, Sloss knew that Tachyus's software would not be able to "unlock significant production increases and cost reductions in [Crescent Point's] water floods."  Sloss knew that Tachyus's software was never designed to work on horizontal wells or in tight reservoirs, and further, was never once tested or modeled on such wells or reservoirs prior to October 18, 2017.  Tachyus was aware that it had only worked with eight customers before Crescent Point, and that all of these eight customers had operations that drastically differed from Crescent Point's operations.  Thus, Sloss was aware that Tachyus could not "unlock significant production increases and cost reductions in [Crescent Point's] water floods," as he knew the software would not work on Crescent Point's wells from the outset.

VI.    THE PARTIES' WRITTEN CONTRACT AND TACHYUS'S SUBPAR PERFORMANCE

60.    In reliance on Tachyus's false promises of added value, software capabilities, innovation and the "risk free," "walk away" payment structure made-up by McNamara,  Sloss and Ken Lawrence ("Lawrence") between April 2017 and January 2018, Crescent Point entered into a Statement of Work ("SoW") with Tachyus on January 12, 2018 to develop Data Physics software for use in Crescent Point's oil fields.  Crescent Point further signed Tachyus's Master Subscription Agreement ("MSA") and Tachyus's Addendum 1: Service Level Agreement (collectively, and together with the SoW, the "Agreement").

61.    Under the terms of the Agreement, work on Crescent Point's Data Physics software would be split into two phases.  During Phase I (hereinafter, the "Backtesting Phase"), Tachyus was required to collect data, develop the Data Physics software pursuant to the data collected, and train Crescent Point employees on how to use the Data Physics software.  Once the Backtesting Phase showed "feasible opportunities for meaningful financial upside for Crescent Point," the work would move into Phase II (hereinafter, the "SaaS Phase").  The SaaS Phase required Tachyus to support and assist Crescent Point in its use and deployment of the Data Physics software.

62.    The Agreement provided that Tachyus was prohibited from invoicing Crescent Point, and that Crescent Point retained the right to terminate the arrangement without paying an early termination fee, if the Backtesting Phase failed to "provide feasible opportunities for meaningful financial upside."  That is, Tachyus was prohibited from invoicing Crescent Point for any fees it incurred, or costs it expended, during the Backtesting Phase if the "results provide[d] no feasible opportunities" for meaningful financial upside for Crescent Point:

**Term & Pricing**

| | |
|---|---|
| Start Date: | January 15, 2018 |
| End Date: | January 14, 2020 |
| | |
| Duration: | 24 Months |
| List Price, Month 1-24: | ~~$300,000 CDN/month~~ |
| Crescent Point Price, Month 1-24: | $150,000 CDN/month* |

Billing:
- Setup Phase (initial 3-4 months): Invoiced at end of Backtest for entire phase.
  *No invoice if Backtest results provide no feasible opportunities
- SaaS Phase (remaining 20-21 months): Invoiced monthly, in advance of services
- Total Cost over Term: $3,600,000 CDN (24 months)

63.     Upon initially executing the Agreement, Tachyus was supposed to begin its research in order to calibrate the software for Crescent Point's use.  This research included touring Crescent Point's wells and investigating any operational constraints.  Tachyus not only failed to tour Crescent Point's wells; it also failed to do any of its own diligence on the unique features of Crescent Point's operations, instead relying on *Crescent Point* to gather and transmit information to Tachyus remotely.  Further, Tachyus's not-yet-developed software was so obviously flawed that the project was permanently stuck in its beginning stages, with Tachyus unable – and in fact unwilling – to develop a software that was compatible with Crescent Point's wells.

64.     All told, Crescent Point spent more than four months simply transferring its data to Tachyus.  The process was burdensome, costly, and fraught with problems.  Tachyus's software was unequipped to handle the daily volume that Crescent Point sent, despite knowing from as early as June 2017 that Crescent Point had an immense amount of data that Tachyus would be required to analyze.  Due to Tachyus's incompetence, the Parties spent what amounted to *more than the entirety* of Tachyus's estimated time for the Backtesting Phase without ever getting a software model up and running.

65.     Additionally, it was *Crescent Point*, not Tachyus, that shouldered the significant burden and expenses during the Backtesting Phase.  In reliance on the "risk-free" Agreement, promise of valuable software, and at Tachyus's continued urging, Crescent Point began developing infrastructure that would allow Tachyus to collect and extract large amounts of data from Crescent Point's wells, all while Tachyus repeatedly requested more and more data from Crescent Point.

Contrary to Tachyus's representations, its software lacked the infrastructure to accept and incorporate the data Crescent Point sent to Tachyus.

66.     Put simply, Tachyus induced Crescent Point to be the guinea-pig for Tachyus's software and to provide development assistance that Tachyus was incapable of supplying, at Crescent Point's own expense. Despite its representations, Tachyus had no capability to collect the volume of data required to model its software for Crescent Point, so Crescent Point had to dedicate a team of engineers and IT specialists to create a new interface just for Tachyus.

67.     In fact, shortly after the Backtesting Phase began, it became clear that Tachyus's employees lacked any understanding of Crescent Point's operations, as it made erroneous, inconsistent, harmful and potentially illegal recommendations to Crescent Point regarding its waterflooding and production operations.

68.     For example, in a meeting with Crescent Point's entire project team in early to mid-July 2018, Tachyus's Principal Reservoir Engineer Garrett Fowler ("Fowler") presented Tachyus's software's results to Crescent Point. These results showed that Crescent Point would somehow see *increased* oil extraction by injecting *significantly less* water into the wells than current levels of water injection. This recommendation concerned Crescent Point, as it is illogical when applied to tight reservoirs. Demonstrating its ignorance, however, Tachyus, through Fowler, blindly disregarded the output of its analytics and characterized these results as a "win."

69.     Regrettably, this was not an isolated incident. Tachyus's software continually generated results that were contrary to established industry standards, and, if implemented, would have caused catastrophic results (not to mention put Crescent Point's operations outside the bounds of strict government regulations and exposed Crescent Point to having to suspend or shut-in well production).

70.     On July 25, 2018, one of Crescent Point's engineers emailed Fowler regarding more anomalous results, flagging the "many anomalies" produced by the software and telling Fowler that the predictions the software was generating were so flawed that they would "raise some eyebrows" among his team members, and he was hesitant to show the results to his team given the "challenges" that the forecasts presented:

On Wed, Jul 25, 2018 at 12:28 PM, Ryan Sinclair <rsinclair@crescentpointenergy.com> wrote:

Hey Garrett, hope your travels are well wherever they may have taken you at the moment.

I've gotten some of the VF Bakken data predctions into Valnav and can now view them against typical production decline forecasting methods. I know these are two different ways of generated forecasts, but there are many anomalies I've seen and wanted your input from the comparsions.

I guess it boils down to, would I want to show these predictions to the other team members as I believe there will be some challenges to the 'data' Acqueon has generated. Yes, it's not a conventional simulation tool either.

If you look at the few plots I've attached, on a whole, the group data 'lines' up pretty well with the last historical data but definitely the individual FC's could rasie some eyebrows. It also looks as though Acqueon has a tougher time predicting newer wells, as the initial rates are much higher than the last fit/learned data point would have been.

71.    The next day, Sinclair identified for Fowler that the software again produced "negative water production," a physical impossibility:

| From: | Ryan Sinclair [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CC6B72E5B63949089E0092A968E25CD6-RYAN SINCLA] |
| Sent: | 7/26/2018 10:44:39 PM |
| To: | Garrett Fowler [garrett@tachyus.com] |
| Subject: | Another Observation.... |

Hey Garrett,

Looks like we have some negative water production in some of the Lower Shaunavon scenarios.......

72.    On July 26, 2018, Fowler responded, acknowledging the absurdity of the result:

On Thu, Jul 26, 2018 at 11:31 PM, Garrett Fowler <garrett@tachyus.com> wrote:
    Well *that* shouldn't be happening. Though might be helpful if you had a disposal problem.

73.    Fowler's email then confirmed the error in Tachyus's software and noted that someone "is writing the code to correct this (and use water rate correction instead of gross), and it will be pushed early next week."  The corrective code was never launched.

74.    Yet again, in a meeting with Tachyus employees, including Fowler and Ken Lawrence ("Lawrence"), on August 23, 2018, Crescent Point told Tachyus that it was concerned with the history matches and optimization forecasts generated by the software and expressed its unhappiness with the Data Physics software.  Crescent Point's concerns were met with silence; no

1  one on the Tachyus side acknowledged or addressed Crescent Point's concerns, let alone took any

2  action to cure the defects.

3      75.    On numerous other occasions, Crescent Point engineers would point out errors and

4  failures within Tachyus's software, and to each, Tachyus engineers would reply that they would look

5  into the issue, but never once corrected any of the issues or failures that Crescent Point identified.

6      76.    Tachyus employees' failure to catch or address the anomalous results generated by its

7  software was troubling to Crescent Point, as it demonstrated a level of incompetence that was

8  contrary not only to what Tachyus had promised during the pitch phase for this business, but also to

9  Tachyus's requirements under Section 6.1 of the Parties' governing Master Subscription Agreement

10 ("MSA").  Section 6.1 of the MSA provided an express warranty by Tachyus that its Data Physics

11 software would "strictly comply with all applicable specifications, descriptions, and other conditions

12 of this Agreement and any Statement of Work and be free of any defects[.]"

13     77.    Tachyus's failure to identify and address these core issues caused Crescent Point to

14 spend significant amounts of time, money and resources on software development, far beyond the

15 three man hours per week that Tachyus had promised Crescent Point in its sales pitch and required

16 far more historical data than represented in the Parties' SoW.  As a result, Crescent Point engineers

17 had to oversee and closely scrutinize Tachyus's software modeling, testing and coding, in addition

18 to developing its own custom user interface to allow Tachyus to collect Crescent Point's data.

19     78.    With full knowledge of its Data Physics software's inability to deliver the desired

20 results, Tachyus, through Fowler, falsely assured Crescent Point via email on April 18, 2018 that for

21 at least two of Crescent Point's wells, Crescent Point could expect "fully fit and predictive models

22 that can be used to identify opportunities for injection modification to improve performance."  But

23 at the same time, in this email, Fowler himself admits that the Parties had not progressed to the SaaS

24 Phase of the project.  On April 30, 2018, Fowler sent another email falsely assuring Crescent Point

25 that its software development was "ahead of […] expectations" and that it could address and resolve

26 the data problems.  However, on May 25, 2018, over four months after the Parties' executed the SoW

27 and beyond the scope of the timeline promised for the Backtesting Phase, Lawrence admitted to

28 Crescent Point that the Parties still had not moved to the SaaS Phase of the Agreement.

79.     Instead of fixing the problems that Crescent Point had identified with respect to the Data Physics software such that it could show "feasible opportunities for meaningful financial upside" as contemplated by the Agreement, on April 18, 2018 Tachyus asked Crescent Point to modify the Agreement and effectively abandon the Backtesting Phase and move straight into the SaaS Phase – indicating that the software had shown "promise" up to that point.  Far from showing "promise," much less "feasible opportunities for meaningful upside," the Data Physics software had been a complete failure.  Thus, Crescent Point was unwilling to modify the Agreement and move into the SaaS Phase before first completing the Backtesting Phase.

80.     As a result, the parties *never progressed* past the Backtesting Phase.

81.     With the benefit of hindsight, it is now clear that Tachyus was aware that its software would never be compatible with Crescent Point's wells, but it nonetheless continued to assure Crescent Point of its software's efficacy so that it could continue to obtain valuable data from Crescent Point's wells to improve its software for use with other clients and receive payment for time Tachyus had spent on "developing" a faulty software product.  This improper exploitation of Crescent Point's data and money is ongoing.

VII.    <u>TACHYUS IMPROPERLY ISSUES AN INVOICE DESPITE ITS SOFTWARE'S FAILINGS</u>

82.     On July 15, 2018, despite the above failings and acknowledgment by Tachyus that the Parties were still in the Backtesting Phase, Tachyus invoiced Crescent Point for $1,050,000 for "work" performed during the Parties' first seven months of engagement, even though Tachyus had not shown any feasible opportunities for meaningful financial upside for Crescent Point, the prerequisite to any payment Crescent Point owed to Tachyus.  In or around September 2018, due to an administrative error, Crescent Point paid this $1,050,000 invoice to Tachyus (the "Erroneous Payment").

83.     Additionally, during this time, *Crescent Point*, not Tachyus, was the party spending significant amounts of money and resources to develop the Data Physics software for its wells, in reliance on Tachyus's promises of added value and waterflood optimization results under the "risk

1  free" Agreement.  As Crescent Point was led to believe, it had nothing to lose by signing up for this

2  "risk free" agreement, because no payment would be owed if the software was a failure.

3        84.    In essence, Crescent Point paid Tachyus to facilitate Tachyus's understanding of tight

4  oil reservoirs on Crescent Point's dollar, and while never receiving anything of value from Tachyus

5  in return.  This arrangement was a far cry from what Crescent Point was led to believe it was signing

6  up for, which was an agreement to receive waterflood optimization software that was already

7  equipped to handle fracking and tight reservoir data, not a trial run at a potential future product

8  offering.

9  VIII.    AFTER SEVEN MONTHS OF EXPLOITING CRESCENT POINT'S BUDGET AND
         RESOURCES, CRESCENT POINT TERMINATES THE AGREEMENT
10
         A.    Crescent Point Sends Tachyus Several Written Communications Confirming Its
11              Decision to Terminate The Agreement

12        85.    By September 2018, it became clear that there was no path to successfully deploy

13  Tachyus's software.  Crescent Point grew tired of bankrolling Tachyus's efforts by dedicating its

14  own resources to test and supply data for Tachyus's use, at no benefit to Crescent Point.  As a result,

15  Crescent Point notified Tachyus that it was putting the project on hold and ceasing efforts under the

16  Backtesting Phase (Phase I) until further notice.

17        86.    Kerry Sandhu ("Sandhu") (Crescent Point) emailed Lawrence twice, on  September

18  10 and September 13, 2018, stating that Crescent Point had decided to put the project *"on hold"* until

19  Crescent Point and Tachyus could meet to discuss the myriad issues Crescent Point had experienced

20  and to establish a new "go forward plan."

21        87.    Subsequent discussions between the Parties confirmed that Tachyus would be unable

22  to resolve the problems that Crescent Point had brought to its attention, and would not be able to

23  deliver a satisfactory, working product.

24        88.    Thus, on February 26, 2019, Crescent Point sent Tachyus a letter with notices of

25  Tachyus's breaches under the Parties' Agreement.  Specifically, Crescent Point alerted Tachyus that

26  it had breached by: i) failing to provide satisfactory results generated by its Data Physics software;

27  ii) failing to provide Crescent Point feasible opportunities for meaningful financial upside after

28

1  attempting to backtest the Data Physics software against Crescent Point's data; and iii)

2  unauthorizedly invoicing Crescent Point for fees associated with the Parties' Agreement.

3          89.     Rather than acknowledge Crescent Point's notice of breach or make any effort to cure,

4  on March 6, 2019, Tachyus responded to Crescent Point's February 26, 2019 letter by including a

5  new "Draft Proposal to Resume Crescent Point Waterflood Optimization."   Tachyus response

6  confirmed that it had, by then, *ceased performance* under the Parties' January 12, 2018 SoW, and

7  proposed a plan to "resume" work on waterflood optimization under the terms of a *newly-proposed*

8  SoW:

9
10
11
12
13
14

### Draft Proposal to Resume Crescent Point Waterflood Optimization

As described in our Letter on March 6th 2019', **Tachyus** would like to achieve a win-win solution for **Crescent Point** that allows resumption of the Waterflood Optimization Project on terms that recognize the dynamic business conditions and change in project personnel.

We recognize that Crescent Point's fields have been produced continuously over the last several months but relevant data for this period has not been input into the Tachyus platform. Further, improvements and enhancements to Tachyus' waterflood optimization software made available to all customers, including Crescent Point, over the past few months may provide new opportunities. To this end, we propose -

15          90.     Crescent Point declined to accept Tachyus's newly-proposed SoW on July 6, 2019,

16  and provided further written notice that Tachyus was in breach of the Parties' original SoW by

17  invoicing and failing to return the Erroneous Payment Crescent Point made.  The July 6, 2019 letter

18  also demanded return of Crescent Point's unlawfully paid funds and valuable data that Tachyus

19  continued to obtain and access throughout this time:

20
21
22
23

Kerry and I were encouraged by our discussion with you and we thank you for taking time to meet with us and prepare the Proposal. We have carefully considered the Proposal in light of our view that the backtesting of the Software still has not been completed and that Tachyus issued the Invoice contrary to the provisions of the SOW, which Invoice was paid by Crescent Point in error (the "**Overpayment**").

Although we are not prepared to accept the terms set forth in the Proposal, we are prepared to forgo our claim for full reimbursement of the Overpayment in exchange for: (i) the payment by Tachyus to Crescent Point of $750,000; and (ii) Tachyus' prompt return of all of the data and information previously provided to Tachyus by Crescent Point in relation to the SOW (collectively, the "**Counterproposal**").

24    B.     Crescent Point's Letters Constitute Notice of Termination Under the MSA

25          91.     Crescent Point provided adequate written notice of termination to satisfy the

26  Termination provision ("Section 9.2") of the Parties' governing MSA.  Section 9.2 of the MSA

27  contains a Termination provision, which requires only that a non-breaching party notify the

28  breaching party of any material breaches and provide the breaching party thirty days' notice to cure

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT          CASE NO. 3:20-CV-06850

1    any defective performance under the Parties' Agreement, which includes the MSA, SoW and

2    Addendum 1 to the MSA ("Addendum 1").  Notably, *any form of written notice* suffices pursuant to

3    Section 9.2:

4
5    **9.2    Termination.** Either Party may, at its option, terminate this Agreement in the event of a material breach by the other
     Party or the other Party is adjudicated bankrupt, involuntarily or voluntarily seeks relief under bankruptcy, reorganization,
6    receivership, liquidation, compromise or other arrangement, or attempts to make an assignment for the benefit of creditors.
     Such termination may be effected only through a written notice to the breaching party, specifically identifying the breach or
7    breaches on which such notice of termination is based.  The breaching party will have a right to cure such breach or breaches
     within thirty (30) days of receipt of such notice, and this Agreement will terminate in the event that such cure is not made within
8    such thirty (30)-day period.

9        92.    Under the terms of the MSA, notice of termination is not a condition precedent to

10   enforcing one's rights under the Agreement.  That is, a party like Crescent Point can bring suit based

11   on the contract, even if the Agreement has not officially been terminated.

12       93.    Crescent Point's February 26, 2019 letter constituted sufficient notice of termination

13   pursuant to Section 9.2 as a written communication that set forth the bases of Tachyus's breach of

14   the Agreement.  Further, thirty days passed and Tachyus failed to cure the identified breaches.

15       94.    Crescent Point's July 6, 2019 letter also constituted adequate notice of termination of

16   the Parties' Agreement under Section 9.2, as it notified Tachyus of the bases of its breaches, and

17   provided Tachyus well beyond thirty days to cure said breaches.

18       C.    Despite Years Of Non-Performance, Tachyus Now Purports To Challenge Whether
              The Agreement Was Terminated
19

20       95.    Tachyus failed to respond to Crescent Point's July 6, 2019 letter, let alone take any

21   actions to try and cure its performance, or demonstrate its belief that Crescent Point failed to

22   effectively terminate the contract.

23       96.    Nevertheless, and despite Crescent Point's communications, on November 20, 2020,

24   Tachyus took the position in this litigation that Crescent Point had not "exercised its termination

25   rights or notified Tachyus of any breach pursuant to the contract's notice provision."  (Dkt. 28 at

26   10:20-21.)

27       97.    Tachyus, to be clear, through its conduct, has deemed the Agreement terminated since

28   before March 2019, when it presented a *new proposal* to Crescent Point to "resume" work.  This new

1  proposal would have constituted a newly-executed SoW that would have displaced the Parties' old

2  agreement, and was for an entirely new set of performance requirements. In short, nothing about

3  Tachyus's "Resume Work" proposal was attempting to continue the Parties' January 12, 2018

4  Agreement.

5       98.     Since March 2019, no one from Tachyus has contacted Crescent Point in connection

6  with the Agreement, not even to respond to Crescent Point's July 9, 2019 letter regarding Tachyus's

7  failures under the Parties' Agreement. Tachyus has taken no steps to deliver Crescent Point a

8  workable software or to otherwise cure any of the breaches that Crescent Point identified to Tachyus

9  in its February 26, 2019 letter. By all accounts, Tachyus's words and actions confirm that Crescent

10  Point properly terminated the Agreement, because, until Tachyus's motion to dismiss in November

11  2020, Tachyus had never once challenged or questioned the adequacy of Crescent Point's termination

12  of the Agreement. In fact, Tachyus, by waiting over two years to raise this issue, has demonstrated

13  its long-held belief that Crescent Point's contention is correct, and that the Parties' Agreement did,

14  in fact, properly terminate.

15       99.     Although Tachyus had, by its conduct, affirmed the termination of the Agreement

16  (and, indeed, had not been heard from for years), in this litigation it took the position that the

17  Agreement was still in effect. To remove any doubt as to whether the Agreement had been

18  terminated and obviate the need for more motion practice on this issue, Crescent Point sent Tachyus

19  a renewed and confirmed notice of termination of the Parties' Agreement on April 29, 2021 ("April

20  2021 Renewed Notice").

21       100.    The April 2021 Renewed Notice also confirms that Crescent Point discontinued all

22  "use" of Tachyus's software no later than September 1, 2018, although such use never materialized

23  and was not beneficial to Crescent Point due to the flaws described herein; does not have any Tachyus

24  Confidential Information, as that term is defined in the MSA, in its possession; and owes no amounts

25  due and payable to Tachyus, consistent with Section 9.3 of the MSA. Crescent Point further

26  identified that "well more than thirty days has passed from [its prior] notices, and Tachyus has failed

27  to cure its breaches." (*See* Ex. 1 (The April 2021 Renewed Notice).) As such, Crescent Point again

28  took all actions required to effectively terminate the contract pursuant to MSA Sections 9.2 and 9.3.

101.    On May 3, 2021, Crescent Point's counsel asked Tachyus's counsel to either stipulate to an extension allowing Crescent Point time to file its First Amended Complaint by May 31, 2021 (the first court day falling more than thirty days after April 29, 2021), or to confirm that Tachyus would not challenge Crescent Point's claims based on any purported pending cure period following the April 2021 Renewed Notice.  Tachyus refused to do either.

**FIRST CAUSE OF ACTION:**

**FRAUD IN THE INDUCEMENT**

102.    Crescent Point adopts and reasserts the allegations contained in paragraphs 1-101 as if fully set forth herein.

IX.    TACHYUS MADE NUMEROUS  MISREPRESENTATIONS TO GAIN CRESCENT POINT'S BUSINESS FROM SEPTEMBER 2017 TO JANUARY 2019

103.    While pursuing Crescent Point as a potential customer, Tachyus made numerous knowingly false representations about its Data Physics software and Tachyus's internal capabilities that induced Crescent Point to justifiably rely on such statements and execute the Agreement, an act Crescent Point would not have done but for Tachyus's fraudulent misrepresentations and that has caused Crescent Point damages of an amount to be determined at trial.

104.    First, on November 16, 2017, McNamara sent Sinclair an email containing Tachyus's "Case Study Executive Summary" that represented that Tachyus's software could use machine learning to quickly and efficiently create forecasts of oil production by predicting and optimizing the pressure with which Crescent Point conducted its waterflooding, the injection rates and speeds it used, and how Crescent Point could maximize oil extraction on its reservoirs.

105.    As of November 16, 2017, and contrary to its representations, Tachyus and McNamara knew Tachyus's software lacked the capability to use machine learning to quickly and efficiently create forecasts of oil production; nor could it predict and optimize the pressure with which Crescent Point should have conducted its waterflooding, the injection rates and speeds Crescent Point should have used, or how Crescent Point could maximize oil extraction on its reservoirs.  Tachyus's software lacked this capability because, as of November 16, 2017, the Data Physics software was still undergoing beta testing and Tachyus had not yet developed these features

1   – in direct contrast to the clear representations made by McNamara.  As such, the Data Physics
2   software did not have sufficient mathematical algorithms or the necessary software capabilities to
3   optimize the pressure with which Crescent Point should have been conducting waterflooding, the
4   injection rates and speeds Crescent Point should have been using, and otherwise lacked any ability
5   to maximize oil extraction.  Tachyus also knew that, at the time, its Data Physics software lacked the
6   ability to optimize any of Crescent Point's waterflooding operations because it had not been
7   programmed for use with Crescent Point's unique reservoir characteristics.  Indeed, the falsity of
8   Tachyus's representations became clear as soon as Tachyus and Crescent Point started executing the
9   Backtesting Phase, as it was evident that Tachyus's software would never work to optimize Crescent
10  Point's waterflooding operations in any calculable capacity.  It took the Parties more than the entirety
11  of the projected Backtesting Phase, approximately four months, just to attempt to transfer Crescent
12  Point's data to Tachyus, let alone begin any sort of backtesting or software modeling at all.

13          106.    Second, on November 16, 2017, McNamara emailed Sinclair Tachyus's "Case Study
14  Executive Summary," which guaranteed that Tachyus's software could complete fieldwide 15-year,
15  1,000 well forecasts for Crescent Point in less than fifteen minutes.

16          107.    As of November 16, 2017, Tachyus knew its software could not complete fieldwide
17  15-year, 1,000 well forecasts for Crescent Point in under fifteen minutes, as it had never been used
18  in connection with horizontal well drills and lacked the capacity to deliver on the company's
19  guarantee.  Indeed, Tachyus knew at the time that any prior uses of its software on vertical well drills
20  were wholly inapplicable to its prospective use with Crescent Point, such that Tachyus indisputably
21  knew that the software could not reasonably complete a 1,000 well forecast incorporating fifteen
22  years' worth of Crescent Point's data in fifteen minutes.  Additionally, Tachyus knew that its
23  software was not developed to gather or analyze the additional categories of data horizontal well
24  drills like Crescent Point's provide, and knew that these additional categories of data would slow
25  down its software's processing time, thereby increasing the time it takes to generate a forecast and
26  rendering it impossible to generate  projections in such a short period of time.  Again, the falsity of
27  this representation and the shortcomings of Tachyus's software became clear once work had begun
28  on the Agreement.

108.     Third, On November 16, 2017 McNamara emailed Sinclair Tachyus's "Case Study Executive Summary," which stated that the "fundamental advantage of the Tachyus technology is the speed at which engineers can create forecasts using Data Physics' patent-pending, modeling technology," promising that Tachyus's model "require[s] only days to set up" and "offer[s] long-term predictive capacity even when historical data is sparse or missing."

109.     As of November 16, 2017, Tachyus and McNamara knew that Tachyus's software could not offer Crescent Point "long-term predictive capacity even when historical data is sparse or missing," nor could the software be set up in mere days.  Tachyus and McNamara were aware that Crescent Point's well count and volume of historical data far exceeded any prior customers' volumes on either front, and that the software (and Tachyus's data receiving platform) was not equipped to process such large amounts of data from sizeable numbers of wells in just days.  Indeed, it took the Parties *over four months* – more than the entirety of the promised Backtesting Phase – just to get Crescent Point's data transferred to Tachyus, because Tachyus's software lacked the ability to receive Crescent Point's data and its engineers were unable to interpret Crescent Point's data as they received it.  Also, as of November 2017, Tachyus's software had only been used to forecast highly permeable oil reservoirs with vertical well data, an entirely different scenario than Crescent Point's operations.  What is more, Tachyus later admitted that its software would not work with "sparse" data, telling Crescent Point engineers that the reason Tachyus's software was failing was due to a lack of data.  Further, Tachyus had only worked with, at most, eight customers on a small number of conventional wells in California with only around 10,000 wells.  For contrast, Crescent Point's Agreement with Tachyus was to run the Data Physics software model on over 6,000 wells, or more than 50% of the total number of wells the software had ever modeled.  Because Tachyus and McNamara knew Tachyus's software did not have any of the capabilities required to work on Crescent Point's wells, and had never worked on a project of similar scope to Crescent Point's oil fields, Tachyus and McNamara knew that the representations Tachyus made regarding its software's capabilities were false.

110.     Fourth, from on or around April 2017 to January 12, 2018, McNamara told Sinclair and other Crescent Point employees that Tachyus's software was capable of analyzing fracking data

for Crescent Point as part of its model. Indeed, on June 15, 2017, Henning exchanged correspondence with Crescent Point and requested that Crescent Point fill out an "asset details" spreadsheet that he prepared in order to begin understanding the makeup and characteristics of Crescent Point's wells. In this spreadsheet, Henning specifically asked for Crescent Point to provide information on its "reservoir challenges" and "operational challenges," seeking to understand information and data about Crescent Point's fracking operations and any other unique characteristics of Crescent Point's wells. Sinclair, replied to Henning with the information he requested, informing Henning that Crescent Point's oil fields contain "tight oil reservoirs," "tight rock," and "natural fractures, folds and faults." Henning responded, confirming that such assets would be included "in an initial scope of work proposal," holding Tachyus out as being able to assess such data.

111. By June 15, 2017, Tachyus, Henning and McNamara knew that Tachyus's software was not able to account for fracking and tight oil reservoirs. In fact, in 2018, Crescent Point's internal team working on the project later audited Tachyus's software and discovered that the software code accounting for fracking in the Data Physics software was added into the code *well after* the Parties executed their Agreement. Thus, at the time Tachyus, McNamara and Henning said that Tachyus's software could account for fracking, the software did not even have source code in the software that did as such. This was yet another knowing misrepresentation by Tachyus to induce Crescent Point to sign the Agreement.

112. Fifth, on November 16, 2017, McNamara sent Sinclair Tachyus's "Case Study Executive Summary," which stated that Tachyus's Data Physics software, when fed with a large sample set of data, would learn how to match previous historical data and then forecast future production based on optimized operating conditions by deploying its "closed-loop system." The "Case Study Executive Summary" described Tachyus's closed-loop system as an automatic, self-sufficient optimizer and predictor that can develop suggestive and informative waterflooding operations with little historical data and validate predictive capacity by continuously "ingest[ing] new data [such that] the updated models optimize reservoir management decisions such as injectant redistribution, in real time throughout the life of the [oil] field."

113.    As of November 16, 2017, Tachyus and its executives knew that they could not credibly make the promises that they did.  Crescent Point made it clear from the outset of discussions between the Parties that the company drills wells that enter oil reservoirs horizontally, each 200 meters apart in order to frack the shale layer inhibiting access to the light oil.  Tachyus was aware that this process vastly differs from the vertical well drill scenarios its software model was built on, which rely on the pressure response metric that is learned by measuring flood pressure and response across wells to re-distribute resources where needed to extract more oil.  Despite knowing that horizontal wells and tight oil reservoirs provide a more complex scenario than the simpler vertical wells Tachyus had previously worked on, Tachyus assured Crescent Point that its closed-loop system would be able to optimize Crescent Point's waterflooding operations, a claim Tachyus knew lacked any basis in fact.  Put simply, Tachyus had never so much as attempted to model its software on tight reservoirs or horizontal wells by November 16, 2017, so Tachyus executives had no basis to claim its "closed-loop system" would perform on Crescent Point's wells, and knew such representation to be false.

114.    Sixth, on November 16, 2017, McNamara emailed Sinclair Tachyus's "Case Study Executive Summary," which represented that Tachyus's software required very little customer intervention in order to work successfully, and that even during the more intensive setup phase of the software development process, customers only needed to provide "as little as 3 man hours/week" to get the software up and running.

115.    Tachyus and McNamara knew by November 16, 2017 that Tachyus's software could not be set  up by using only 3 man hours per week.  Rather, Tachyus and McNamara knew that Crescent Point's required investment would always exceed 3 man hours per week, given its platforms inability to receive and process Crescent Point's data.  Tachyus and McNamara further knew that Tachyus had no basis for claiming that its software could feasibly be set up with less than 3 man hours per week of investment on Crescent Point's end given that Tachyus had never worked on a tight reservoir, let alone any reservoir with Crescent Point's well count and volume of data.  Further, Tachyus's software was still undergoing beta testing, receiving new features and upgrades, making it impossible for Tachyus to have known an accurate set up time as of November 2017.

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT          CASE NO. 3:20-CV-06850

116. Seventh, on November 16, 2017, McNamara sent Sinclair Tachyus's "Case Study Executive Summary," which matched Tachyus's other promises and overall messaging by representing that its Data Physics software allowed for "rapid adoption with minimal time and IT investment" by the customer.

117. McNamara knew that its misrepresentation about its Data Physics software requiring "minimal time and IT investment" was false on November 16, 2017. At the time McNamara made this misrepresentation to Sinclair, Tachyus was still beta testing its product, and did not have workable software on which to base this claim. Tachyus also was well aware that, due to the nature and configuration of Crescent Point's tight oil reservoirs, its waterflooding scenarios were complex, producing and collecting vast amounts of data such that transmitting and uploading this data onto Tachyus's new and still beta tested software could cause the software to crash. Given the complexity of Crescent Point's reservoirs and Tachyus's underdeveloped software model, Tachyus and McNamara knew that Crescent Point would need more than "minimal time and IT investment," and that Crescent Point would need to invest substantial amounts of its own labor and resources to try to bring Tachyus's software up to a level that could potentially be used for complicated reservoirs.

118. Eighth, on May 26, 2017, McNamara, as further inducement, promised Crescent Point that "the backtest really is a risk free exercise for CPG [Crescent Point] in that if [Tachyus was] not able to define optimization opportunities [it would] not proceed." Again, on October 19, 2017, McNamara offered Sinclair this same "risk free" agreement. Under McNamara's and Tachyus's "risk free," "walk away" guarantee, Crescent Point would not be required to pay Tachyus for any fees incurred until its Data Physics software provided Crescent Point "feasible opportunities for meaningful financial upside." As McNamara stated in an October 19, 2017 email to Sinclair, "[i]f for some reason there are NOT sufficient opportunities to create value, we [Tachyus] will walk away. This is why we term this 'risk free'" (emphasis in original):

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT          CASE NO. 3:20-CV-06850

- As discussed in the SOW we sent you, the contract is 2 year is total length. It is broken into 2 parts.

    ○ First (~~2-4 months) is the Backtest/Setup period. In the Backtest/Setup period we will onboard all of your data for the different fields we have selected. (We still have some work to do here I believe to single out the exact fields) During this time we work with your engineers on how to build the fits and predictions along with the optimization.

        ■ At the end of this Backtest/Setup period we will have a very good idea on what the value creation will be. Assuming there are sufficient optimization opportunities we move into the second phase, the SaaS phase. If for some reason there are NOT sufficient opportunities to create value, we will walk away. This is why we term this "risk free".

        ■ During the Backtest phase there are no payments due by CPG. At the end of the Backtest, assuming it demonstrates the engagement will be successful, the previous monthly payments are due and the regular payment terms kick in.

    ○ Second (~~4-24 months) we are in the SaaS phase and implementing changes in the field and measuring results.

119.  Tachyus and McNamara knew well before October 19, 2017 that an Agreement with Crescent Point would be anything but "risk free."  Tachyus executives such as McNamara were highly motivated to say whatever was necessary to secure Crescent Point's business in the 2017 fiscal year in order to both boost Tachyus's bottom line and expand its business into Canada, a company-wide pursuit that Tachyus would stop at nothing to achieve.  This economic motive, coupled with the fact that Tachyus executives like McNamara knew that Tachyus's software was in its infancy and still undergoing development, and the novelty and complexity of Crescent Point's data set and waterflooding operations, made it impossible for an engagement with Tachyus to ever generate value at no risk to Crescent Point.  In fact, Tachyus and McNamara knew at the time that Tachyus needed substantial assistance from Crescent Point's engineers and IT team to help develop software that could potentially be applied to a complicated tight oil reservoir like Crescent Point's.  And, when predictably, Tachyus's software would fail to create any value for Crescent Point, it would be a win-win situation for Tachyus: it would have had the opportunity to learn from Crescent Point's top-flight engineering and IT team, and it would have had access to Crescent Point's invaluable oil field information (which could be used to try to develop its software for future use with complicated oil operations).  As an added bonus, Tachyus would subsidize this operation by improperly charging Crescent Point for its time.  As McNamara well knew, it was a "risk free" engagement for Tachyus, not for Crescent Point.

120.     Ninth, on April 25, 2017, McNamara emailed Sinclair and Fiorentino, claiming that Tachyus's Data Physics software could "automatic[ally] incorporate[e] log data" into the software to enhance "multi-objective optimization techniques[.]"

121.     As of April 25, 2017, Tachyus knew that its software could not handle the significantly higher volume of data that tight oil reservoirs like Crescent Point's produce, and that it could not incorporate Crescent Point's data into its software model.  As such, the data transfer process proved to be anything but "easy," and Tachyus's software failed to even store, let alone incorporate or model, any results based on Crescent Point's data.  Tachyus and McNamara were aware that Tachyus's software had never been used on tight oil reservoirs before, and could not say how the influx of Crescent Point's tight oil reservoir data would work with the Data Physics software.  In fact, Tachyus was so overwhelmed by the data transfer alone (let alone any analysis of the data) that Crescent Point had to deploy its own IT specialist to develop a completely new data transfer system (spending hundreds of hours creating this program, uploading data and repackaging data in a way that worked with Tachyus's software model).  Put simply, Tachyus knew that it had no credible basis to assure Crescent Point that it could handle its data transfer with ease.

122.     Tenth, on November 16, 2017, McNamara sent Sinclair Tachyus's "Case Study Executive Summary," which claimed that Tachyus's Data Physics software enabled engineers to beat their baseline forecasts by ~30% and their best case by ~20%.

123.     Tachyus and McNamara knew by November 16, 2017 that the software would never provide such dramatically positive results for Crescent Point.  Tachyus had only worked with eight California-based customers prior to pursuing Crescent Point, none of which had produced from tight oil reservoirs, fracked, or used horizontal well drills.  Instead, Tachyus's prior customers all had high permeability oil reservoirs that required no fracking and used vertical well drills to extract oil.  By drawing its basis of comparison to "conventional" wells and reservoirs, which is a completely different species from Crescent Point's "unconventional" wells and tight oil reservoirs, Tachyus and McNamara were able to make its software seem more effective and powerful than it really was.  In reality, the software had *never been modeled on tight oil reservoirs*, and McNamara and Tachyus could not have known whether and how its software would perform.  In fact, Tachyus even admitted,

in a November 16, 2018 email from Saks, that Tachyus's software did not "explicitly model hydraulic fractures in horizontal wells," despite Tachyus's claims that its software could handle and had experience in modeling fractured systems.

124.    Eleventh, on November 16, 2017, McNamara emailed Sinclair Tachyus's "Case Study Executive Summary," which claimed that Tachyus's Data Physics software could increase its customers' revenue by as much as $60 million per reservoir that deployed the software, and help increase and enhance overall oil production.

125.    Tachyus and McNamara knew that Tachyus's representations about potential financial upside to Crescent Point were not only false, but that Tachyus also had no basis to make such representations about Crescent Point's economic gains as of November 16, 2017.  Tachyus had only worked with eight California-based customers prior to pursuing Crescent Point, none of which had production from tight reservoirs, engaged in fracking, or used horizontal well drills.  Further, Tachyus had only tested its software on eight customers, and had no idea how its software would be able to improve revenue on more complex, larger-scale drilling and production operations.  Simply put, Tachyus was out of its depths with respect to Crescent Point's operations, and had no basis to claim whether or how well its software would work on Crescent Point's wells and reservoirs.

126.    Twelfth, on October 18, 2017, Tachyus's co-founder Sloss represented in an email to Girtzfeldt that Sloss was "confident that using Tachyus at CPG [Crescent Point]" would "unlock significant production increases and cost reductions in [Crescent Point's] water floods."

127.    On or before October 18, 2017, Sloss knew that Tachyus's software would not be able to "unlock significant production increases and cost reductions in [Crescent Point's] water floods." Sloss knew that Tachyus's software was never designed to work on horizontal wells or in tight reservoirs, and further, was never once tested or modeled on such wells or reservoirs prior to October 18, 2017.  Tachyus and Sloss were aware that Tachyus had only worked with eight customers before Crescent Point, and that all of these prior customers had operations that drastically differed from Crescent Point's operations.  Thus, Tachyus and Sloss were aware that Crescent Point could not "unlock significant production increases and cost reductions in [Crescent Point's] water floods," as

1  Tachyus and Sloss knew the Data Physics software would not work on Crescent Point's wells from

2  the outset.

3  X.    TACHYUS INTENDED TO DEFRAUD CRESCENT POINT OUT OF ITS MONEY
        AND VALUABLE WELL DATA THROUGH ITS MISREPRESENTATIONS.

4

5          128.    Tachyus intentionally represented to Crescent Point that its software had the above-

6  stated capabilities in order to induce Crescent Point into an agreement whereby Tachyus could use

7  Crescent Point's wells to collect tight oil reservoir data, horizontal well data, fracking data, and

8  information on waterflooding operations.  Tachyus sought this information in order to try to develop

9  new software capabilities that would allow it to expand its client base across different types of

10 reservoirs and geographic areas.

11         129.    Tachyus further intended to exploit Crescent Point by having Crescent Point and its

12 employees serve as a tester for its product, dedicating Crescent Point's own resources for the sole

13 purposes of improving Tachyus's product.  Access to Crescent Point's data and its team of engineers

14 and IT specialists provided Tachyus with the ability to make significant improvements to its Data

15 Physics software and grow its business, at no benefit to Crescent Point.

16         130.    Crescent Point was falsely induced to expend hundreds of hours to both oversee and

17 closely monitor Tachyus's testing and software results, based on Tachyus's representations that

18 Tachyus would present it with a workable product.  However, Tachyus's Data Physics SaaS solution

19 never could, and never did, "robustly optimize to find injection/infill scenarios that satisfy [Crescent

20 Point's] constraints and objectives[.]"

21         131.    Tachyus never had the capabilities to deliver on its promises to Crescent Point.

22 Instead, Tachyus's real motives have been revealed – to  make a profit in 2017 and to gain access to

23 Crescent Point's wells and hoard its data for purposes well outside of the intended use by Tachyus.

24         132.    Further, Tachyus's intent to defraud can be seen when looking at the clear lies

25 Tachyus told, including: that its software was equipped to accommodate fracking; that its engineers

26 had knowledge about tight reservoirs and horizontal production; that Crescent Point would surely

27 get positive results by using Tachyus's software; and that doing a deal with Tachyus would be "risk

28 free" for Crescent Point, all of which reveals that Tachyus was a company desperate to boost its

1  bottom line and achieve its business objectives at all costs, including committing fraud in order to

2  close a deal.  That Tachyus would make these claims while its product was still being *beta tested*

3  demonstrates Tachyus's intent to lure Crescent Point in and secure its business through grossly

4  overstated promises of performance and capabilities that its software simply did not have at the time.

5       133.    Tachyus's intent to deceive is also evidenced by communications from  McNamara

6  and Sloss stressing Tachyus's urgent desire to sign Crescent Point.  Throughout the negotiation

7  period, McNamara sent Crescent Point employees numerous emails, pushing to get the deal done as

8  quickly as possible on a "risk-free" basis.  McNamara reached out to Sinclair from April through

9  November  2017 in an effort to "make a push in Q4" and "get this deal done soon[,]" evidencing his

10  desire to quickly finalize a deal in order to turn a profit.

11  XI.    CRESCENT POINT'S RELIANCE ON TACHYUS'S MISREPRESENTATIONS WERE
        JUSTIFIED
12

13       134.    Crescent Point reasonably relied on all of the above-stated misrepresentations in

14  deciding to execute the Agreement with Tachyus.  That is, but for the specific representations

15  Tachyus made regarding its software's specific capabilities and the engineers working on software

16  development and testing, Crescent Point would not have entered into the Agreement with Tachyus.

17       135.    Crescent Point's reliance on Tachyus's misrepresentations was justified.  At the time

18  Crescent Point was negotiating with Tachyus, Crescent Point's only source of information about

19  Tachyus's product was from Tachyus itself.  Crescent Point had no reason to previously know about

20  Tachyus or its Data Physics software, and had no reason to distrust Tachyus's representations.  In

21  fact, Tachyus held itself out as a leading provider of prescriptive analytics for oil and gas operators.

22  Tachyus's repeated representations that it could achieve Crescent Point's goals that ultimately

23  convinced Crescent Point to take a chance with Tachyus, as Crescent Point truly believed that

24  Tachyus had the capabilities to perform and execute its software model even on Crescent Point's

25  tight oil reservoirs.

26

27

28

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT          CASE NO. 3:20-CV-06850

XII.    CRESCENT POINT HAS BEEN HARMED BY TACHYUS'S FRAUDULENT CONDUCT

136.    Crescent Point has suffered damages from Tachyus's fraudulent inducement. Crescent Point had to expend significant resources, including hundreds of hours of IT and engineering time in vain attempts at improving Tachyus's defunct software.  All told, Crescent Point was, in all material respects, the only party working to move the project forward, spending and diverting its own resources.

137.    Crescent Point has been damaged by Tachyus's fraudulent misrepresentations in an amount including $1,050,000, the value of Crescent Point's well data, the costs Crescent Point spent in reliance on Tachyus's false promises (including engineer and IT labor costs), and upwards of $120 million, the amount of added value Tachyus warranted that its software would provide Crescent Point.

## SECOND CAUSE OF ACTION:

## BREACH OF WRITTEN CONTRACT

138.    Crescent Point adopts and reasserts the allegations contained in paragraphs 1-137 as if fully set forth herein.

XIII.    THE PARTIES' AGREEMENT IS A VALID AND ENFORCEABLE WRITTEN CONTRACT BETWEEN CRESCENT POINT AND TACHYUS.

139.    Executed on January 12, 2018, the MSA, the SoW, and Addendum 1 constitute the full and final Agreement between Crescent Point and Tachyus to develop Data Physics software for Crescent Point's wells, reservoirs and waterflood operations.

XIV.    CRESCENT POINT HAS DULY PERFORMED ALL OBLIGATIONS UNDER THE AGREEMENT, EXCEPT TO THE EXTENT SUCH OBLIGATIONS HAVE BEEN EXCUSED.

140.    Although it is not a condition precedent to this claim, it is abundantly clear that Crescent Point properly terminated the Parties' Agreement pursuant to the relevant provisions of the Parties' MSA and SoW.  (*See supra* ¶¶ 85-101.)

141.    Tachyus has also tried to argue throughout this litigation that Crescent Point breached

1 the Parties' Agreement at various other points. This is false.

2     142. Separate and apart from Crescent Point terminating the Agreement, Tachyus has

3 further taken the position that Crescent Point failed to allege its own performance because it

4 purportedly did not request an audit, direct Tachyus to accelerate work in progress reporting, review

5 KPIs, or exercise its termination right. These positions misstate the terms of the Parties' Agreement.

6 Crescent Point either took such actions, was prevented from taking such actions because of

7 Tachyus's failure to perform its obligations under the Agreement, or was not obliged to take such

8 actions because, under the terms of the Agreement, such actions were purely discretionary and not a

9 required condition under the Parties' Agreement.

10     143. First, because Tachyus failed to perform its obligations under the Agreement, there

11 were no such records for Crescent Point to request in the first instance. Instead, Crescent Point

12 repeatedly identified Tachyus's failures to Tachyus and asked Tachyus to cure its performance.

13 Moreover, the right to request an audit is a *discretionary* right that Crescent Point held, and was not

14 a prerequisite to terminating the Parties' Agreement:

15
16        **Audit.** Tachyus shall maintain all records pertaining to the performance of its obligations under this
contract for a period of 24 months after such performance. Crescent Point, upon reasonable notice
in writing to Tachyus, shall have the right at any time within such 24-month period to audit such
17        records as may be reasonably necessary for the purposes of ensuring that the obligations of
Tachyus are being performed in accordance with this contract and for substantiating any charges
appearing on invoices rendered by Tachyus.
18

19     144. Regarding accelerating Tachyus's work, Crescent Point repeatedly directed Tachyus

20 to fix issues with its software, which issues caused delay. These communications, and Tachyus's

21 failure to take effective corrective actions, were a bar to any "acceleration" of Tachyus's work. Put

22 differently, it was impossible for Tachyus to accelerate its work and fix the delays it caused, because

23 Tachyus lacked a workable product or competent employees. To the extent Tachyus claims that

24 these ongoing complaints from Crescent Point were insufficient, it is clear that any technical right

25 by Crescent Point to direct Tachyus to accelerate its work was *discretionary*. Again, this was not a

26 requirement or prerequisite to Crescent Point's decision to terminate the Parties' Agreement.

27 Crescent Point's decision to terminate the MSA without burning more time on Tachyus's failure to

28 perform does not preclude Crescent Point's claims or the relief sought.

145.    Crescent Point further was not required to terminate under the SoW's KPIs provision. Indeed Crescent Point could not so terminate, because, based on Tachyus's failings and deficiencies in its software, the parties never progressed out of Phase 1, which was necessary before any review of KPIs:

> **KPIs.** Tachyus and Crescent Point agree that the foundation of a successful long term working relationship is key to safe operations, accountability and commitment to continuous improvement. As a mechanism to track and monitor performance against these foundational elements, Crescent Point and Tachyus will develop and implement KPI's as described in Phase 1A and comply with the Service Level Agreement attached as Addendum 1.
>
> If any of the above KPI's are not met in any one quarterly reporting period during which Crescent Point follows at least 85% of the recommended *Aqueon* candidates, Tachyus shall provide Crescent Point with a complete summary of the performance deficiency, reasons for missing the KPI target, and clearly outline actions taken to bring performance back up to the targeted KPI level in a timely manner.
>
> If there have been any missed KPIs in two successive quarterly periods during which Crescent Point follows at least 85% of the recommended *Aqueon* candidates, then Parties shall agree on a comprehensive remediation plan. Tachyus shall implement any agreed to changes in the Tachyus' operating practices needed to bring performance back to the targeted KPI level.

146.    Crescent Point has thus complied with all of its performance obligations under the Parties' Agreement.

XV.    TACHYUS BREACHED THE PARTIES' AGREEMENT ON MULTIPLE GROUNDS.

147.    Tachyus, by contrast, failed to perform and has breached the Agreement on multiple grounds.

A.    Tachyus Failed to Deliver a Product that Complied with All Applicable Specifications and was Free of Defects Under Section 6.1 of the MSA

148.    Tachyus breached the Parties' MSA by failing to provide a product that "strictly compl[ied] with all applicable specifications, descriptions, and other conditions of this Agreement and any Statement of Work" and that was "free of any defects" (emphasis added).

149.    Far from offering a long-term solution with quick-setup that could provide adequate information to Crescent Point with sparse or missing, Tachyus's Data Physics software continuously failed to provide any sort of predictive capacity.

150.    By failing to provide a workable product at any point in time, and by providing a product which generated results that would have been harmful to Crescent Point's waterflooding operations, and possibly even illegal, Tachyus further breached the MSA by failing to provide a service that was "*free of any defects*" (emphasis added).

151.    For example, on July 26, 2018, roughly *a year and a half* after Crescent Point engaged Tachyus, Tachyus was *still* providing Crescent Point with backtesting results that were nonsensical. Crescent Point repeatedly pointed out these erroneous results to Tachyus, even going so far as to identify "bugs" in Tachyus's source code, as Fowler himself admitted, but Tachyus still never provided a software that was "free of any defects[:]"

> For the model runs - you identified a bug that crept up this week after we were cleaning up our code base in that your Bryant and Benson fits that said 'Running' had actually failed but the UI was failing to change the display even though it looked like they were running for a couple days or longer. Fahy (computing guru on the phone during training) is working on fixing this now.

152.    Tachyus failed to take any affirmative steps to cure its software's erroneous results. Tachyus knew that its Data Physics software was producing flawed results. However, when Tachyus learned about these issues, its engineers acknowledged the problem, but never cured them.  Even further, in April 2018, and in front of Tachyus's looming May deadline to complete the Backtesting Phase, Fowler, who realized that Tachyus was nowhere near ready to provide a software model that showed "feasible opportunity for meaningful financial upside" for Crescent Point, asked Crescent Point if it would modify the contract such that Tachyus could still move forward on the project so long as the software showed a "promise" of finical upside.

153.    In asking for this contractual modification, Tachyus itself concedes that its software could not perform as the Parties agreed upon.  Further evidence that Tachuys failed to fix defects in its software come from the clearly erroneous results the software consistently produced.  From either indicating that Crescent Point use negative water production on some of its wells to projecting that the wells would produce no oil, and to telling the entire Crescent Point team that it should inject substantially less water to increase oil production in July 2018, the software never once produced a realistic oil production model compatible with Crescent Point's needs and use.

B.      Tachyus Failed to Perform Required Diligence Pursuant to the Statement of Work

154.    Tachyus also failed to conduct diligence and tour relevant sites to understand the operational constraints and field operator perspective prior to and while engaging in Backtesting, in violation of the Parties' SoW.  In fact, Tachyus never toured any of Crescent Point's relevant well-sites, instead relying on Crescent Point to provide its reservoir data and describe the operating

conditions of its wells to Tachyus.  Because of Tachyus's failure to tour the relevant field sites, Tachyus was unable to develop a predictive model for *any* of Crescent Point's wells on *any* field identified in the SoW.

C.    Tachyus Failed to Supply Qualified Personnel Pursuant to the Statement of Work

155.    Tachyus also expressly breached the Parties' SoW by failing to supply personnel qualified to perform the services and work related to developing the Tachyus software for Crescent Point.

156.    The key personnel Tachyus supplied, such as Fowler and Lawrence, were incapable of modeling Tachyus's software for tight oil reservoirs, and had no working knowledge to be able to perform Tachyus's duties under the Agreement.  Nor did anyone else on Tachyus's team have any of the requisite skills and experience to be able to interpret and model data for Crescent Point's use.

157.    Indeed, in a July 2018 meeting, Tachyus presented Crescent Point with results that were clearly erroneous, yet presented the erroneous results as a "success" for Tachyus's software model.  Specifically, Fowler showed Crescent Point results from its model that suggested Crescent Point use significantly less water production to increase oil extraction.  In this moment, Crescent Point realized how deeply unqualified Fowler and Tachyus were in tight oil development and operations.  Even a basic understanding of tight oil production would help one realize that waterflooding reservoirs like Crescent Point's require significant water injection, given the nature of the formations with which its casing runs to extrude oil from the subsurface shale layer.  That Fowler did not realize that the software's results were erroneous shows how deeply unqualified he was to perform the work he was doing, and shows Tachyus's violation of the SoW.

158.    Further, Tachyus violated the Parties' SoW by outsourcing its development, monitoring, forecasting and control operations for its backtesting work to "offshore" third-party engineers who were unfamiliar with Crescent Point's unique tight oil reservoirs for as little as $21 per hour.  However, at the same time as it was outsourcing backtesting work, Tachyus was charging Crescent Point $150,000 per month for this same backtesting and software development work.  That is, Tachyus was charging Crescent Point $150,000 per month for work Tachyus's own engineers were not performing, contrary to the provisions of the Agreement,.

159.    According to invoices issued from QASource, a third-party contractor to Tachyus, QASource provided Tachyus with third-party engineers to "[p]roduc[e] effective test plans, documentation and specifications that [could] be used both internally and externally" and to meet "the needs of [Tachyus's] external customers."

160.    Specific work performed by these contract engineers also included "backend database verification, business logic testing, front-end field validation, navigation flow, and verification of application flow[,]" which covers the work that Tachyus was *supposed* to be performing for Crescent Point with its own internal team of engineers subject to Crescent Point's approval under the terms of the MSA.  Not only did Tachyus not inform Crescent Point of its outsourcing practice, which began in at least October 2015, but it failed to give Crescent Point the option to exercise its approval rights over this team of engineers, as was required under the MSA.

161.    Having such approval rights and control over the team working on Crescent Point's software was extremely important to Crescent Point, as its wells and reservoirs are highly unique and require a specialized knowledge of the region and of Crescent Point's fields in particular, which third-party engineers who work "offshore" were wholly unaware of.

162.    Even without the approval rights, Tachyus's failure to provide any engineers, whether outsourced or not, who could competently perform the history matches, Backtesting and software development to bring the software to the requisite level of performance Tachyus indicated it could provide, was a breach of the Parties' SoW.  Tachyus's team of engineers, internal and outsourced contractors, failed to deliver a software free of defects or errors.

   D.    <u>Tachyus Improperly Invoiced Crescent Point for Money It Did Not Owe, as the Software Never Provided Feasible Opportunities for Financial Upside, Pursuant to the Statement of Work</u>

163.    Tachyus was prohibited from sending Crescent Point an invoice if the Backtesting results provided no feasible opportunities for financial upside for Crescent Point.  Tachyus was aware that the Backtesting Phase never progressed to the point of demonstrating *any* opportunity for financial upside for Crescent Point.

164.    Fowler and Lawrence confirmed both in April and May 2018 that the Parties had not progressed to the SaaS Phase and were still in the Backtesting Phase for lack of proven results from Tachyus's software model.

165.    Despite Tachyus's awareness and express agreement that there was no meaningful opportunity for financial upside for Crescent Point, Tachyus sent Crescent Point an invoice of $1,050,000 for work performed during the "risk-free" Backtesting Phase in clear breach of the Agreement.

166.    Crescent Point repeatedly informed Tachyus that the invoice was issued in violation of the SoW, which expressly prohibited Tachyus from issuing any invoice if the Backtesting Phase failed to show feasible opportunities for meaningful financial upside for Crescent Point, both through email conversations about the nonsensical results Tachyus's product was producing and via written letters notifying Tachyus of such breach.

E.    Tachyus Failed to Return Crescent Point's Well and Field Data, in Violation of Section 5.2 of the MSA

167.    Tachyus then failed to return Crescent Point's well and field data, which Crescent Point expressly sought the return of in its July 9, 2019 letter and which Crescent Point was rightfully entitled to under the Parties' Agreement.

168.    The Parties' MSA provides that at the disclosing Party's election (here, Crescent Point), the receiving Party (Tachyus) must "destroy or return to the other Party any tangible copies of the Confidential Information [defined to include data provided by the customer in Section 5.3 of the MSA] and permanently delete all electronic copies of the Confidential Information in its possession or control and will certify in writing to the disclosing Party that it has completed the foregoing."

169.    From July 9, 2019, to September 30, 2020, when Crescent Point filed its initial Complaint in this matter (Dkt. 1), Tachyus failed to return Crescent Point's data and failed to provide written certification to Crescent Point that it had completed the requested data return, thereby breaching Section 5.2 of the MSA.

XVI.  CRESCENT POINT  SUFFERED DAMAGES AS A RESULT OF TACHYUS'S NUMEROUS BREACHES

170.    As a direct and proximate result of Tachyus's breaches, Crescent Point has suffered and continues to suffer damages in an amount to be determined at trial, but not less than $1,050,000, as well as attorneys' fees and costs, to which Crescent Point is entitled pursuant to the terms of the Agreement.

171.    Crescent Point has also suffered damages based on expenditures in connection with developing a custom interface to allow Tachyus to collect Crescent Point's data for its software development, and significant labor hours involved in trying to cure and oversee Tachyus's performance.  Crescent Point's custom interface it built for the data transfer to Tachyus is not only useless to Crescent Point without Tachyus's software, but Tachyus's material breaches have also delayed Crescent Point in setting up its own in-house reservoir simulator to provide Crescent Point with waterflood optimization projections.

**THIRD CAUSE OF ACTION:**

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

172.    Crescent Point adopts and reasserts the allegations contained in paragraphs 1-171 as if fully set forth herein.

XVII. CRESCENT POINT'S AND TACHYUS'S AGREEMENT CONTAINS AN IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.

173.    Under California law, every contract contains an implied duty of good faith and fair dealing, which requires the parties to a contract to deal with each other in good faith and not act in a manner designed to deprive a party of known or expected benefits of a contract.  Through the Agreement, Tachyus was obligated not to do anything to unfairly interfere with Crescent Point's right to receive the benefits of the contract.  Tachyus's commitment to good faith means it must hew to honesty of purpose, without any intention to mislead or to take unfair advantage of Crescent Point. The obligations of the covenant extend beyond the formation of the contract and include its

1  performance and enforcement.  Thus, under this duty, Tachyus must do everything the contract

2  presupposes it will do to accomplish the Agreement's purposes.

3  XVIII.  <u>CRESCENT POINT HAS DONE EVERYTHING THE CONTRACT PRESUPPOSES IT
   WILL DO TO ACCOMPLISH THE AGREEMENT'S PURPOSES.</u>

4

5       174.    Crescent Point fully performed its duties under the Parties' Agreement, including by

6  providing Tachyus with all of its well and field data.  Crescent Point also provided adequate notice

7  of breach and termination under the Parties' MSA.

8       175.    Crescent Point spent hundreds of thousands of dollars in good faith, and pursuant to

9  its obligations under the Parties' Agreement, because of Tachyus's promise, as memorialized in the

10 MSA, that it would use Crescent Point's historical well and field data to deliver a version of its Data

11 Physics software that would adequately predict and model Crescent Point's waterflood operations to

12 reach optimal results.    Crescent Point went so far as to spend significant time and resources

13 developing a custom data transfer program just to send Tachyus its tight oil reservoir and horizontal

14 well data, all in the hopes that Tachyus would use this data to develop a fit and predictive model for

15 Crescent Point to use on its waterflooding operations.    Crescent Point thus complied with its

16 performance obligations under the Agreement by providing Tachyus all of the data and information

17 it needed.

18      176.    Crescent Point also complied with the MSA's notice of breach and termination

19 provisions (Sections 9.2 and 9.3).  Crescent Point informed Tachyus of Tachyus's breaches of the

20 Parties' Agreement on February 28, 2019, though that was  not the first time Tachyus knew about

21 Crescent Point's unhappiness.  On September 10 and September 13, 2018, Crescent Point informed

22 Tachyus that it was putting the project on hold "until further notice" due to Tachyus's failure to

23 provide feasible backtesting results that demonstrated an opportunity for meaningful financial upside

24 for Crescent Point.  On February 26, 2019, Crescent Point informed Tachyus that it was in breach of

25 the Parties' Agreement for failing to develop software that could move past the Backtesting Phase

26 and for improperly invoicing Crescent Point in light of that failure.  On July 9, 2019, Crescent Point

27 again informed Tachyus that it continued to breach the Agreement by failing to produce software

28

1  that could move past the Backtesting Phase and for improperly invoicing, and retaining, Crescent

2  Point's Erroneous Payment, all in violation of the SoW.

3      177.    The July 9, 2019 letter also sought the return of Crescent Point's well data, which

4  Tachyus was required to turn over per Section 5.2 of the MSA.  Tachyus has failed to return any and

5  all of Crescent Point's data.

6      178.    Crescent Point's April 2021 Renewed Notice further set out the specific claims of

7  Tachyus's breach and explicitly demanded that Tachyus return or destroy all of Crescent Point's data

8  that it has retained unlawfully in violation of MSA Section 5.2.

9  XIX.    TACHYUS FAILED TO ACT FAIRLY AND IN GOOD FAITH AND PREVENTED
         CRESCENT POINT FROM RECEIVING BENEFITS UNDER THE CONTRACT

10

11      179.    Tachyus has not done everything the contract presupposes it will do to accomplish

12  the Agreement's purposes.  Tachyus failed to use good faith efforts to develop the Data Physics

13  software for Crescent Point and unfairly deprived Crescent Point of the benefits of the contract by

14  refusing to use such good faith efforts.

15      180.    Tachyus unfairly deprived Crescent Point of the benefits of the Agreement by

16  knowing from as early as April 2017 that its software was not capable of meeting Crescent Point's

17  satisfaction, but continuing to pursue Crescent Point as a customer in order to gain access to Crescent

18  Point's unique and extremely valuable well and reservoir related data for further business ventures.

19      181.    Tachyus improperly lied to Crescent Point about its capabilities in order to obtain

20  access to Crescent Point's unique and valuable tight oil reservoir data and information.

21      182.    Tachyus was aware that, under the Parties' MSA, Tachyus would be granted a limited

22  license to use its customer's (here, Crescent Point's) reservoir and well data for specific purposes

23  related to "Tachyus's Services."  Under the terms of the MSA, "Tachyus's Services" refer explicitly

24  to Tachyus's work in software development and customization of software for each customer.  Thus,

25  Tachyus had a limited license to use Crescent Point's data in connection with developing *Crescent*

26  *Point's* Data Physics software to meet *Crescent Point's* satisfaction.

27      183.    Tachyus did not have a license to use Crescent Point's data for any other purposes.

28

184.    Tachyus used Crescent Point's data to enhance and build its software for use with other customers, evidencing Tachyus's bad faith intent to obtain and access this data for its own commercial purposes.

185.    That is, Tachyus took volumes of Crescent Point's data, that Crescent Point provided in good faith attempts to help Tachyus perform under the Agreement, and used such data to develop improvements and enhancements to Tachyus's software for use with future customers, and failed to make such improvements to Crescent Point's software per the terms of Tachyus's license.

186.    Far beyond using the data within the scope of Tachyus's license, Tachyus knew that once it had access to Crescent Point's data, it could use and access that data in any way it wanted, allowing Tachyus to reap significant long-term benefits from engaging Crescent Point regardless of its performance under the Parties' Agreement.

187.    Further, Tachyus continues to exploit Crescent Point's data by continually updating and upgrading its software offerings and features to new customers, using Crescent Point's tight oil data to make itself competitive in an entirely new market and entirely new region, which was Tachyus's goal from the moment it began working with Crescent Point.

188.    In fact, Tachyus has demonstrated how important Crescent Point's data is to its long-term operations by refusing to return the data even after Crescent Point expressly demanded that Tachyus return all of its reservoir and well data in July 2019.

189.    Tachyus's refusal to return Crescent Point's data and its continued exploitation of such data to enhance its software for its own purposes and for use with other customers evidences Tachyus's bad faith intent to obtain and access this data for its own commercial purposes.

XX.    <u>CRESCENT POINT HAS SUFFERED DAMAGES AS A RESULT OF TACHYUS'S BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>

190.    As a direct and proximate result of Tachyus's breaches, Crescent Point has suffered and continues to suffer damages in an amount to be determined at trial, but not less than $1,050,000 and the value of Crescent Point's labor hours and time spent developing a data transferral system for Tachyus to access Crescent Point's data.  Crescent Point is also entitled to its attorneys' fees and costs.

**FOURTH CAUSE OF ACTION:**

**UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200) – FRAUDULENT AND UNFAIR BUSINESS PRACTICES**

191.    Crescent Point adopts and reasserts the allegations contained in paragraphs 1-190 as if fully set forth herein.

XXI.    TACHYUS IS BASED IN CALIFORNIA, AND ITS CONDUCT GIVING RISE TO THIS CLAIM EMANATES FROM CALIFORNIA

192.    Tachyus's principal business office is located in the Bay Area, California and the Agreement was formed under and pursuant to the laws of the State of California.

193.    The Agreement states that all actions arising out of it must be brought in State or Federal court in San Francisco, California, and all notices under the Parties' Agreement must be provided to Tachyus at its San Francisco, California address.

194.    Certain of Tachyus's employees working on Crescent Point's defunct software, including Fowler and Lawrence, were based out of California, both of whom made misrepresentations and conducted unfair business practices from Tachyus's principal offices in California.

195.    Further, during the relevant time period, Tachyus had only developed its software in California. Thus, testing of its software, and the generation of results purportedly referenced in its marketing materials, occurred and were obtained in California.

196.    Having only worked with California companies and having conducted and developed the testing that served as the "Case Study" for Tachyus's marketing materials in California, Tachyus became aware of its software's capabilities, or lack thereof, in California.    Thus, all misrepresentations made with respect to Tachyus's software's capability and its efficacy stem from its conduct and contact with California.

XXII.    MEMBERS OF THE PUBLIC ARE LIKELY TO BE DECEIVED BY TACHYUS'S FRAUDULENT BUSINESS PRACTICE

197.    Tachyus's customers, much like Crescent Point, are unaware that Tachyus may have an ulterior motive and attempt to falsely induce customers to sign Agreements for software it has no

1  intention, or capability, to successfully develop, all in an effort to gain access to customers' well and

2  reservoir data for Tachyus's own software development and commercial purposes.

3  198.    Tachyus targeted Crescent Point due to its unique tight oil reservoirs, horizontal well

4  and waterflooding program, and its location in Canada.

5  199.    Between April 2017 and January 2018, Tachyus executives McNamara, Sloss and

6  Lawrence, made numerous false representations to Crescent Point in order to fraudulently induce

7  Crescent Point to contract with Tachyus for fruitless software that Tachyus knew would never work

8  on Crescent Point's wells and reservoirs.

9  200.    From as early as September 2017, and without any background in tight oil, horizontal

10  well data modeling, Tachyus represented that its software could accommodate Crescent  Point's

11  voluminous data, complex fracking operation and delicate features of its horizontal well drills, all of

12  which were false when made as described above.  That Tachyus would make these claims when its

13  software was being *beta tested* shows that Tachyus was set on achieving its goals at any cost.  Further,

14  Tachyus's prior history evidences its experience gap.  When Tachyus pursued Crescent Point, it had

15  only worked with eight customers, all in California, and none of which had oil fields with the unique

16  characteristics that Crescent Point's has.  As such, Tachyus had no basis to claim knowledge in tight

17  oil production, and it instead chose to blatantly lie about what its software could do, going as far as

18  to ensure successful results if Crescent Point used the software.

19  201.    From April 2017 to January 2018, McNamara, Sloss and Lawrence represented that

20  Tachyus's Data Physics software, when fed with a large sample set of data, would learn how to match

21  previous historical data and then forecast future production based on optimized operating conditions.

22  That is, Tachyus executives represented to Crescent Point that its Data Physics software would be

23  able to instruct Crescent Point's engineers to use more or less water injection volumes, shut-in an

24  injector, speed up or slow down producers, and more in order to optimize waterflood operations in

25  Crescent Point's oil and gas wells and reservoirs and increase Crescent Point's revenue from

26  production.

27  202.    Tachyus executives McNamara, Sloss and Lawrence knew this statement was false at

28  the time they made this statement.  Tachyus was aware that Crescent Point had tight oil reservoirs

1  that were substantially different from any other customer Tachyus had before, as Tachyus spent

2  months attempting to prove how it could add value to Crescent Point's operations through

3  presentations and data demonstrating its value proposition.  However, at this time, Tachyus's product

4  was still undergoing significant development, with Tachyus adding software updates and upgrades

5  and continuing to beta test, update and upgrade the software while pursuing Crescent Point.

6  203.    Further, Tachyus executives were deceitful when Crescent Point repeatedly asked

7  how its software could, and would, handle the unique features of Crescent Point's oil fields and

8  horizontal wells.  Each time Crescent Point brought this up from April 2017 until the Parties signed

9  the SoW, Tachyus assured Crescent Point that it would have no problem with Crescent Point's data,

10  oil fields or horizontal wells, and that the Data Physics software would work as well as it did with

11  prior customers.  As described above, these misrepresentations were false from the start.  Thus,

12  McNamara, Sloss and Lawrence had no basis to claim that the Tachyus software had any of the

13  above-stated capabilities, let alone as applied to Crescent Point, which had unique tight oil reservoirs.

14  204.    While pitching Crescent Point for its business in November 2017, McNamara also

15  falsely represented to Crescent Point, through Tachyus's "Case Study Executive Summary," that

16  Tachyus's Data Physics software could be developed with as little as "3 man hours/week" on the

17  customer's end.  Tachyus and McNamara knew that this claim was false when made.  Tachyus

18  understood that Crescent Point's operations involved complex, voluminous well and reservoir data,

19  unlike any kind of well or reservoir data Tachyus had worked with before.  With no experience or

20  knowledge in tight oil reservoir productions, and without a single forecast or predictive model for

21  tight oil reservoirs, McNamara still sent marketing material that claimed that Tachyus's Data Physics

22  software model could be quickly developed with as little as three man hours per week.  Further,

23  McNamara sent this material all while knowing the software was still being beta tested, and was thus

24  too underdeveloped to make the strong claims and value propositions that Tachyus made.

25  205.    On November 16, 2017, McNamara, by and through Tachyus's "Case Study

26  Executive Summary," also falsely represented that Tachyus's Data Physics software could "robustly

27  optimize to find injection/infill scenarios that satisfy [customers'] constraints and objectives."

28  Tachyus and McNamara knew that this claim was false as applied to Crescent Point, an oil producer

1  whose wells and reservoirs held unique and rare tight oil that was unlike any other well or reservoir

2  Tachyus had worked on before to develop its software.  Instead of admitting to its inexperience with

3  wells and reservoirs such as Crescent Point's, Tachyus instead warranted that it could add as much

4  as $120 million in value to Crescent Point's operations, despite knowing it had never worked on tight

5  oil wells or reservoirs before, and despite the fact that its software was still in beta testing and

6  undergoing development and was not a final product with a "proven track record" of success like

7  Tachyus claimed.

8      206.    On November 16, 2017, McNamara further used Tachyus's "Case Study Executive

9  Summary" to misrepresent that Tachyus's Data Physics software would "allow for rapid adoption

10  with minimal time and IT investment, while ensuring adoption and sustainability into existing

11  workflows."  This statement was knowingly false when made, as Tachyus was well aware that its

12  novel software had only been adopted by eight California customers with entirely different well and

13  reservoir characteristics, such that there was no "proven track record" of success related to this claim.

14  Nor was there a "proven track record" of success as applied to tight oil reservoirs, a question Crescent

15  Point repeatedly asked and that Tachyus repeatedly dismissed, instead responding to Crescent Point

16  with lies about its capabilities in tight oil operations.  Further, Tachyus knew that it was still

17  conducting software development and beta testing for its Data Physics SaaS program, such that the

18  software was nowhere near customer-ready.  As such, Tachyus had no basis to claim that its software

19  could ensure adoption and sustainability or allow for rapid adoption with minimal IT time.

20      207.    Tachyus was also well aware that Crescent Point's oil wells and reservoirs were

21  highly unusual, using horizontal well drills and fracking to access tight oil.  Tachyus further knew

22  that the corresponding oil data from Crescent Point's reservoirs could not be obtained by any other

23  oil producer in the region.  As such, and given the fact that Tachyus's Data Physics software was

24  still in beta testing that required significant development and upgrades, Tachyus had every intention

25  of engaging Crescent Point solely for access to its valuable data, without any regard as to whether or

26  not its software would actually work.

27      208.    Given what Crescent Point knows now, it is clear that Tachyus made these false

28  representations in order to secure Crescent Point's business and collect data from Crescent Point's

1  oil and gas wells in order to develop additional software capabilities for use with future customers.

2  Tachyus continues to exploit Crescent Point's data to enhance and build its software for use with

3  other customers.

4  XXIII. <u>CRESCENT POINT RELIED ON TACHYUS'S REPRESENTATIONS</u>

5        209.    Crescent Point reasonably relied on Tachyus's misrepresentations.   At the time

6  Crescent Point was negotiating with Tachyus, Crescent Point's only source of information about

7  Tachyus's product was from Tachyus itself.

8        210.    Further, Crescent Point had no reason to previously know of Tachyus or its Data

9  Physics software, and had no reason to distrust Crescent Point's representations.  In fact, it was

10 Tachyus's repeated representations that it could achieve Crescent Point's goals, risk-free, that

11 ultimately convinced Crescent Point to take a chance with Tachyus.  Crescent Point truly believed

12 that Tachyus had the capabilities to perform and execute its software model, including on Crescent

13 Point's "unconventional plays" and tight oil reservoirs.

14       211.    Additionally, Crescent Point could not have been aware of Tachyus's ulterior motives

15 prior to contracting, as Crescent Point was not in a position to learn the truth about Tachyus's

16 software until after it had signed the contract with Tachyus and provided Tachyus with its data.

17 XXIV. <u>CRESCENT POINT HAS SUFFERED SUBSTANTIAL HARM FROM TACHYUS'S</u>
        <u>FRAUDULENT BUSINESS PRACTICE</u>
18

19       212.    Crescent Point has been directly harmed by Tachyus's actions.  Crescent Point has

20 lost its Erroneous Payment made contrary to the terms of an Agreement that it would not have entered

21 but for Tachyus's fraudulent business practices.  Crescent Point has also lost the value of its tight,

22 unconventional oil well and reservoir data that Tachyus refuses to return and continues to use for its

23 own commercial gain, at Crescent Point's expense.  Crescent Point has further lost out on the added

24 value Tachyus promised Crescent Point would receive if it deployed Tachyus's Data Physics SaaS

25 solution, which ranged from $60 million to $120 million.

26       213.    As a result of Tachyus's fraudulent business practices in violation of Cal. Bus. & Prof.

27 Code § 17200, Crescent Point first seeks damages in an amount to be proven at trial, but no less than

28 $1,050,000, the value of Crescent Point's data, and the promised value of Tachyus's software, as

1    well as attorney's fees and costs.  Alternatively, Crescent Point seeks rescission of the Parties'

2    Agreement based on Tachyus's fraudulent inducement and fraudulent business practices.

3        214.    Crescent Point also brings a violation under the "unfair" prong of Cal. Bus. & Prof.

4    Code § 17200 for Tachyus's unfair business practices.

5    XXV.  <u>TACHYUS'S OUTSOURCING PRACTICE IS AN IMMORAL, UNETHICAL OR
        UNFAIR BUSINESS PRACTICE THAT CAUSES SUBSTANTIAL HARM TO ITS
6        VICTIMS THAT OUTWEIGHS ANY BENEFIT TO TACHYUS</u>

7        215.    Tachyus's business practice of outsourcing work to unqualified "offshore" engineers

8    for pennies on the dollar while representing to its customers that Tachyus's own engineers and

9    employees would be conducting software development and testing on the customer's Data Physics

10   software is an unethical, immoral or unfair business practice that deeply harms consumers in a way

11   that outweighs any benefit to Tachyus.

12       216.    Tachyus's outsourcing practice began in or around 2015, where Tachyus signed a

13   contract with third-party contractor QASource to supply Tachyus with third-party "offshore"

14   engineers who would attempt to conduct various software development and backend testing for

15   Tachyus's customers.  These third-party engineers lacked the requisite credentials, experience, and

16   capabilities to perform the work necessary to deliver a working product, including as-promised to

17   Crescent Point.

18       217.    Tachyus never represented to Crescent Point that it engaged in such a practice.  Quite

19   opposite, Tachyus warranted to Crescent Point that its own internal team of qualified key personnel

20   would work on Crescent Point's software development and backtesting, and even went so far as to

21   give Crescent Point approval rights over the team of Tachyus engineers and key personnel that would

22   be working on the project.

23       218.    Despite its representations and promises, and Crescent Point's approval rights over

24   the team of engineers, Tachyus continued its outsourcing practice, which caused "offshore"

25   engineers with no working knowledge of Crescent Point's unique wells and reservoirs to conduct the

26   important backtesting and software development work for Crescent Point's Data Physics software,

27   possibly leading to Tachyus's substantial failure to provide any workable and useable backtesting

28   results under the Parties' Agreement.

219.    Furthermore, Tachyus outsourced its software development and testing operations to these third party engineers for as little as $21 per hour, while charging Crescent Point a *discounted* rate of $150,000 per month for Backtesting Phase work its engineers and employees were not performing.  In fact, Crescent Point's $150,000 per month fee was a discounted rate, meaning that Tachyus's other customers are charged even higher monthly fees for services Tachyus does not actually perform.

220.    Tachyus engaged in this undisclosed practice of outsourcing its software development and testing operations to "offshore" third-party engineers, which it passed off as its own employees, from approximately 2015 through early 2018, and possibly even into March 2019.  This means that Tachyus was actively engaged in this outsourcing practice while representing to Crescent Point that it would have approval rights over Tachyus's *internal* team of key personnel and engineers working on backtesting.

221.    Tachyus never informed Crescent Point of its outsourcing arrangement at any point during the Parties' negotiations or anytime thereafter.  Other customers who enter into agreements with Tachyus are unaware that Tachyus outsources its work to third-party engineers overseas for drastically lower prices than what Tachyus charges customers for its software development services.

222.    Further, and irrespective of Tachyus's outsourcing, Tachyus simply failed to provide competent workers to perform the bargained for Agreement, a basic component to any contract that Tachyus did not care to perform.  Whether its outsourced workers did not understand the nuances of Crescent Point's wells, Tachyus, in any event, failed to staff Crescent Point's case with any competent engineers who had any experience with tight oil reservoirs.  However, at the time, Tachyus held itself out has being able to perform competently  for tight oil reservoir companies such as Crescent Point.

223.    Crescent Point, and other customers similarly situated, have no way of knowing that Tachyus is grossly misstating its software's capabilities and its team's knowledge base. Consequently, customers who are in a lesser position to know Tachyus's outsourcing model will continue to be bamboozled by Tachyus's "bait and switch" business model again and again.

224.     Crescent Point, and customers similarly situated, are harmed by having to pay fees that are grossly disproportionate to Tachyus's costs.

225.     After being sold on Tachyus's qualified internal team of engineers' services, customers like Crescent Point are being charged staggering amounts in monthly fees, from $150,000 per month and higher based on non-discounted rates, yet are receiving work that is not conducted by the party the customer believes is doing the work.  That is, Tachyus led Crescent Point to believe it was paying $150,000 per month in exchange for *Tachyus's* internal team of engineers and software developers to conduct backtesting, when in reality, a third-party engineer was conducting such work for pennies on the dollar.  Tachyus's "team" was no more than a glorified middleman extorting the customer for more money while providing no input or contribution.  Moreover, these external contractors are sorely underqualified to do the work Tachyus directs them to perform.

226.     While businesses are allowed to charge higher prices than their costs in order to make a profit, business like Tachyus are *not* allowed to engage in deceptive marketing in order to make it seem like a customer is paying for its services, only to realize that the business does not perform said services.  Such action is an abuse of the business's heightened knowledge and bargaining power over the buyer in a bare attempt to scam customers out of money.  Tachyus did exactly that, and thus, Tachyus's behavior far exceeds the normal bounds of acceptable markups to turn a profit for the business.

XXVI. <u>TACHYUS'S REFUSAL TO RETURN ITS CUSTOMER'S PROPERTY, AND ITS USE SUCH PROPERTY TO FURTHER ITS OWN BUSINESS GOALS IS AN IMMORAL, UNETHICAL OR UNFAIR BUSINESS PRACTICE THAT CAUSES SUBSTANTIAL HARM TO ITS VICTIMS THAT OUTWEIGHS ANY BENEFIT TO TACHYUS</u>

227.     Tachyus's intent to gather and use Crescent Point's data is clear from the MSA itself, as Tachyus reserved the right to use and control its customer's data throughout the period where Tachyus was providing its service to the customer.  The MSA also gives Tachyus the ability to use its customers' data for its use on updates and upgrades to Tachyus's Data Physics software

1  throughout the time Tachyus provides its services to its customers, showing Tachyus's true motive

2  to obtain and access Crescent Point's data for its own commercial development ends.

3      228.    Despite the fact that Tachyus never sufficiently performed its service or provided

4  Crescent Point with any meaningful waterflood optimization results, Tachyus was quick to ask for

5  vast amounts of Crescent Point's data, including much more historical data than Tachyus represented

6  in its pre-contractual statements and in the SoW itself.

7      229.    Tachyus has subsequently refused to return any of Crescent Point's data, despite

8  Crescent Point's express demand it do so in July 2019.

9      230.    Tachyus's continued refusal to return Crescent Point's data reveals Tachyus's true

10 intent — to gather and collect as much data from Crescent Point as possible to further its own

11 commercial goals.

12     231.    This business practice is deeply unfair to Tachyus's customers, including Crescent

13 Point, who have no say in how Tachyus further exploits Crescent Point's data and information for

14 Tachyus's own gain, even while providing the customer with nothing of value in return.  This "bait

15 and switch" business model, which lures customers in with false promises and then gives the

16 customer no workable product (whether due to outsourcing or Tachyus's own ineptitude), should not

17 be rewarded by allowing Tachyus to then utilize its customers' data – long after Tachyus's "services"

18 conclude – to further refine and develop its Data Physics software for Tachyus's gain, with no

19 reciprocal benefit to the customer.

20 XXVII.    CRESCENT POINT HAS BEEN DIRECTLY HARMED BY TACHYUS'S
          FRAUDULENT AND UNFAIR BUSINESS PRACTICES
21

22     232.    As a direct and proximate result of Tachyus's unethical, immoral or unfair business

23 practice of outsourcing its software development and backtesting work to offshore engineers for

24 pennies on the dollar, Crescent Point has been harmed, as the persons who worked on the software

25 deployed for use by Crescent Point lacked the ability and skills to deliver a workable software

26 product.

27     233.    As a result of Tachyus's complete and utter incompetence, Crescent Point was forced

28 to expend its own resources to address and correct Tachyus's software's performance failures, all on

Crescent Point's dollar.  Had Tachyus supplied properly qualified personnel, as was promised by Tachyus repeatedly when negotiating the Agreement, rather than rely on unqualified third party contractors who were strangers to Crescent Point's unique oil and gas operations, Crescent Point would not have needed to spend its own time and money troubleshooting and reacting to problems posed by the software's interface and lack of capabilities.

234.    However, Tachyus did outsource its work to unqualified contractors and did knowingly supply Crescent Point with internal mangers such as Fowler and Lawrence, both of whom Tachyus knew did not have the requisite skills to effectively oversee this project or the contract engineers.  Due to their gross incompetence and inability to even understand the basics of the tight oil industry, and due to its contractors providing shoddy work product on reservoirs and oil fields it has no understanding of, Crescent Point had to spend hundreds of thousands of dollars having its IT staff and engineers audit, monitor and investigate Tachyus's software for bugs, errors, holes in the code, and more.  When Crescent Point would explain the problems, Tachyus's engineers would struggle to follow, and repeatedly passed off harmful and illogical software results as "successes" of its software.  Tachyus's next turn of invoicing Crescent Point for fees of up to $150,000 per month — after its software failed to produce even *logical* results — is unconscionable.

235.    Other customers are harmed by Tachyus's unfair business practice even more than Crescent Point was, as Tachyus's $150,000 per month fee represented a discounted rate for Crescent Point.  The SoW itself contemplates monthly fees as high as $300,000 per month for work Tachyus passes off as its own *internal* team of engineers' work but is, in fact, the work of unqualified "offshore" engineers with little to no knowledge of each customer's particular oil and gas reservoirs.  As such, Tachyus's other customers are being charged well over $150,000 per month for work that Tachyus outsources to "offshore" engineers for as little as $21 per hour, a greatly injurious practice when considering the fact that customers do not even receive a workable product and lose access to their proprietary data.

236.    Further, regardless of whether the work was outsourced, Tachyus's own team working on projects do not know what they are doing, and such an extreme experience gap cannot

1  justify such high fees, particularly when the software lacks even the most obviously-needed

2  capabilities for various oil and gas producers.

3      237.    By refusing to return its customers' data and by using the data outside the scope of

4  the license the customer grants Tachyus so that Tachyus can enhance and improve its software's

5  capabilities for the next customer, each customer is repeatedly cheated out of potential earnings

6  Tachyus made off of the customer's hard work and unique assets.  In addition, Tachyus pays no cost

7  for this data, and acquires it as part of the business deal, meaning that the customer, in essence, pays

8  Tachyus to take its data and help make Tachyus richer with each software update.  Such a "bait and

9  switch" business model deeply harms customers by devaluing the one thing that  makes their wells

10  and reservoirs unique—their data.   As such, Tachyus's practice of retaining its customers'

11  wrongfully acquired money and data has also harmed Crescent Point in an amount to be proven at

12  trial, but no less than the amount of the Erroneous Payment plus the value of Crescent Point's data

13  that Tachyus received and refused to return.

14      238.    Further, by exploiting the terms of Tachyus's Agreements with its customers to

15  engage in this self-serving gamesmanship, Tachyus breaches the trust that customers place in

16  Tachyus to protect their data and property rights.  Tachyus understands the fear that its customers

17  will rip off Tachyus's software, thus vigorously working to protect its own property rights, but fails

18  to do the same with its customers.  Tachyus cannot have its proverbial cake and eat it too by

19  benefitting off of its fraudulent and unfair behavior.

20      239.    As a result of Tachyus's unfair and fraudulent business practices, Crescent Point has

21  been harmed in an amount to be proven at trial, but no less than the amount of the Erroneous Payment

22  plus the value of Crescent Point's data that Tachyus received access to through misrepresentations

23  and the use of outsourced backtesting labor and the amount of added value Tachyus promised that

24  Crescent Point would receive from using its Data Physics software, as well as Crescent Point's

25  attorneys' fees and costs.

26

27

28

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT          CASE NO. 3:20-CV-06850

**FIFTH CAUSE OF ACTION:**

**UNJUST ENRICHMENT**

240.    Crescent Point adopts and reasserts the allegations contained in paragraphs 1-239 as if fully set forth herein.

XXVIII.    TACHYUS'S FRAUDULENT MISREPRESENTATIONS GIVE CRESCENT POINT A BASIS TO RESCIND THE PARTIES' AGREEMENT AND ALLEGE UNJUST ENRICHMENT

241.    Due to Tachyus's fraudulent inducement and fraudulent and unfair business practices, Crescent Point has grounds to seek rescission of the Parties' Agreement.  In the event the Parties' Agreement is rescinded, Crescent Point seeks to recover the unjust benefits Tachyus retains at Crescent Point's expense, including the unjust benefits Tachyus received from Crescent Point's resources expended in improving Tachyus's software, Tachyus's retention of the Erroneous Payment and Tachyus's retention of Crescent Point's tight oil well and reservoir data that it uses to improve its Data Physics software for future customers.

242.    Crescent Point pleads, in the alternative to money damages under the Parties' Agreement, that Tachyus has been unjustly enriched by Crescent Point's efforts to perform under the Agreement, by Tachyus's refusal to return Crescent Point's Erroneous Payment and Tachyus's refusal to return Crescent Point's valuable data.

XXIX.    TACHYUS RECEIVED AND RETAINED AN UNJUST BENEFIT AT CRESCENT POINT'S EXPENSE

243.    Tachyus gained an unjust benefit by retaining the benefits of Crescent Point's engineer and IT labor hours it spent in reliance on Tachyus's fraudulent misrepresentations.

244.    Tachyus also has been unjustly enriched by refusing to return Crescent Point's Erroneous Payment.  Given that the software failed to provide any feasible opportunities for meaningful financial upside, and no money was owed to Tachyus under the Agreement, Crescent Point's Erroneous Payment has unjustly enriched Tachyus.  Crescent Point receives no reciprocal benefit from its Erroneous Payment, as it has received no workable software as no backtesting results providing feasible opportunities for meaningful financial upside.

245.    Tachyus also continues to be unjustly enriched by receiving the benefit of having access to, and making use of, Crescent Point's valuable and unique tight oil data, which allows Tachyus to use Crescent Point's data to further refine and develop its Data Physics software for use with future customers.  Crescent Point receives no reciprocal benefit for such use and access to Crescent Point's data, and has been unable to secure return of its data despite express requests for Tachyus to return this data to Crescent Point.

XXX.  <u>CRESCENT POINT RELIED ON TACHYUS'S MISREPRESENTATIONS TO ITS DETRIMENT AND TO TACHYUS'S BENEFIT</u>

246.    Crescent Point expended hundreds of thousands of dollars in engineering and IT labor hours to transfer substantial amounts of Crescent Point's rare and valuable tight oil well data to Tachyus.  Crescent Point expended even more resources to develop Tachyus's Data Physics software for Tachyus, all in an effort to produce reliable waterflood optimization through backtesting results that would have allowed the Parties to move forward under the Agreement.

247.    Crescent Point's engineering team analyzed Tachyus's backtesting results, pointed out flaws and errors in Tachyus's system, provided large amounts of historical data and ran backtesting instead of Tachyus in an attempt to find a workable solution to Tachyus's abject failure to perform under the Parties' Agreement, which Tachyus fraudulently induced Crescent Point to enter into.  Crescent Point's IT team spent countless hours, diverted time away from other necessary work, developing a custom-made data transfer software that would allow Tachyus to access and obtain huge amounts of Crescent Point's valuable tight oil well and reservoir data, in amounts that far exceeded what Tachyus represented was necessary to produce effective backtesting results.

248.    As a result of Crescent Point's efforts, time and money, Tachyus has received the benefit of Crescent Point's engineering and IT labor, which has allowed Tachyus to further refine and develop its Data Physics software for use with future customers.

249.    Allowing Tachyus to retain the benefit of the value Crescent Point added through its labor, time, money and data expended in reliance on the fraudulent contract would be unjust, as Crescent Point has received no reciprocal benefit.

250.    Additionally, under Tachyus's promised "risk free" engagement, Tachyus was prohibited from issuing any invoice for backtesting work done until and unless the backtesting results showed feasible opportunities for meaningful financial upside for Crescent Point.  Tachyus's Jeff McNamara was the person who came up with the "risk free," "walk away" payment structure, so Tachyus was acutely aware of its rights and obligations with respect to when Crescent Point was required to pay for Tachyus's services.

251.    Crescent Point repeatedly informed Tachyus of flaws in the Data Physics software and of the erroneous and harmful results the Parties' backtesting was providing Crescent Point. Crescent Point also repeatedly informed Tachyus that it did not think the Data Physics software was ready to move from the Backtesting Phase into the SaaS Phase, as the software provided no feasible opportunities for meaningful financial upside for Crescent Point.  However, Tachyus still invoiced Crescent Point for seven months of work "performed" during the Backtesting Phase, which Crescent Point paid in error.

252.    Allowing Tachyus to retain Crescent Point's Erroneous Payment is unjust, as Tachyus acquired these funds through fraudulent misrepresentations aimed at inducing Crescent Point to contract with Tachyus.

253.    Allowing Tachyus to retain access to Crescent Point's data is unjust, as Tachyus acquired this data through fraudulently inducing Crescent Point into executing the Agreement and misrepresenting the value Tachyus's software would provide if Crescent Point provided Tachyus this data.

XXXI. CRESCENT POINT HAS BEEN HARMED BY TACHYUS'S UNJUST ENRICHMENT

254.    As a direct and proximate result of Tachyus's failure to return the Erroneous Payment and its use of Crescent Point's data and work product, Tachyus has been unjustly enriched in an amount to be determined at trial, but not less than the $1,050,000 furnished by Crescent Point, plus the costs Crescent Point incurred to assist Tachyus in developing the Data Physics software and the value of Crescent Point's light oil data that Tachyus continues to use and exploit, as well as Crescent Point's attorneys' fees and costs.

1

## **PRAYER FOR RELIEF**

2

**WHEREFORE, Plaintiff Crescent Point respectfully prays for relief as follows:**

3    a)    For judgment in favor of Crescent Point against Tachyus on all Causes of Action;

4    b)    For an order granting rescission of the Agreement between Crescent Point and
5          Tachyus;

6    c)    For an order enjoining Tachyus from exploiting the data it improperly obtained from
          Crescent Point, including by ordering Tachyus to destroy any and all retained copies
7          of such data, and to destroy and cease using any software Tachyus developed in
          connection with its access to that data;
8

9    d)    For equitable relief in the form of disgorgement and restitution; or in the alternative:

10   e)    For compensatory damages arising from Tachyus's breach of contract and unlawful
          behavior according to proof at trial;
11

12   f)    For pre-judgment and post-judgment interest on such monetary relief;

13   g)    For punitive damages; and, in any event

14   h)    For costs of suit, including reasonable attorneys' fees; and

15   i)    For such other relief as this Court may deem proper.

16

17   DATED: May 7, 2021            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

18                                 By: _____/s/ Lance A. Etcheverry_____
                                        LANCE A. ETCHEVERRY
19                                      CAROLINE VAN NESS
                                        OLIVIA L. VADEN
20
                                        *Attorneys for Plaintiff*
21                                 CRESCENT POINT ENERGY CORPORATION

22

23

24

25

26

27

28

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT        CASE NO. 3:20-CV-06850

1

## **DEMAND FOR JURY TRIAL**

2        Crescent Point respectfully requests a trial by jury on all issues so triable.

3

4    DATED: May 7, 2021                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

5                                      By: _____*/s/ Lance A. Etcheverry*_____
                                               LANCE A. ETCHEVERRY
6                                              CAROLINE VAN NESS
                                               OLIVIA L. VADEN
7
                                               *Attorneys for Plaintiff*
8                                      CRESCENT POINT ENERGY CORPORATION

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CRESCENT POINT ENERGY CORP.'S FIRST AMENDED COMPLAINT        CASE NO. 3:20-CV-06850