United States District Court
Northern District of California

1
2
3         IN THE UNITED STATES DISTRICT COURT
4         FOR THE NORTHERN DISTRICT OF CALIFORNIA
5

6   CRESCENT POINT ENERGY CORP.,        Case No.  20-cv-06850-MMC
7               Plaintiff,              **ORDER GRANTING IN PART AND
                                        DENYING IN PART DEFENDANT'S
8          v.                           MOTION TO DISMISS FIRST
                                        AMENDED COMPLAINT; AFFORDING
9   TACHYUS CORPORATION,                PLAINTIFF FURTHER LEAVE TO
                                        AMEND**
10              Defendant.

11

12         Before the Court is defendant Tachyus Corporation's ("Tachyus") Motion, filed

13   June 9, 2021, "to Dismiss First Amended Complaint."  Plaintiff Crescent Point Energy

14   Corp. ("Crescent Point") has filed opposition, to which Tachyus has replied.  Having read

15   and considered the papers filed in support of and in opposition to the motion, the Court

16   rules as follows.[1]

17                              **BACKGROUND**

18         In its First Amended Complaint ("FAC"), Crescent Point alleges that it is an "oil

19   producer" (see FAC ¶ 1), that Tachyus provides "software" services (see id.), and that, on

20   January 12, 2018, Crescent Point and Tachyus entered into a written contract

21   (hereinafter, "the Agreement") (see FAC ¶ 29), under which Tachyus "grant[ed] Crescent

22   Point the right to access and use Aqueon, powered by Data Physics, optimization

23   software for waterflooding, and the associated professional services and support" (see

24   Richmann Decl. Ex. B at 10).[2]  According to Crescent Point, it entered into the Agreement

25

26         _____

           [1] By order filed August 10, 2021, the Court took the matter under submission.

27         [2] Tachyus's unopposed request that the Court take judicial notice of the three
28   documents comprising the Agreement (see id. Exs. A-C) is hereby GRANTED.

United States District Court
Northern District of California

in "reliance on Tachyus's description of its product offering and repeated assurances that its software could – and would – produce reliable results for Crescent Point's waterflooding operations to improve and enhance oil extraction" (see FAC ¶ 8), which statements, Crescent Point alleges, were "knowingly false representations" (see FAC ¶ 103).

The Agreement, bearing a "Start Date" of January 15, 2018, and an "End Date" of January 14, 2020, was to be performed in two phases.  (See Richmann Decl. Ex. B at 10.)  The first phase, referred to as the "Setup Phase" or, alternatively, the "Backtesting Phase," was, as of the time the parties entered into the Agreement, anticipated to last "3-4 months," and the second phase, referred to as the "SaaS Phase,"[3] compromised the remainder of the 24-month period.  (See id.; FAC ¶ 61.)  Under the Agreement, Crescent Point was to pay a monthly fee of $150,000, but Tachyus would not send the first invoice until the "end of Backtest."  (See Richmann Decl. Ex. B at 10.)  Additionally, the Agreement provided that "[n]o invoice" would issue "if Backtest results provide[d] no feasible opportunities."  (See id.)

Crescent Point alleges that, prior to Tachyus's entering into the Agreement, Tachyus had only worked with customers who "utilize[d] vertical well drills for oil extraction" and that Tachyus had never worked with a company that, like Crescent Point, "use[d] horizontal well drills, engage[d] in fracking[,] or use[d] waterflooding to extract oil from tight reservoirs."  (See FAC ¶ 20; see also FAC ¶¶ 2-3 (explaining differences between Crescent Point's oil fields and those of Tachyus's "then-existing customers").)  According to Crescent Point, after the parties entered into the Agreement, Tachyus was unable to develop software that was "compatible with Crescent Point's wells" (see FAC ¶ 63), and that, on "numerous" occasions, "Crescent Point engineers would point out

---

[3] "SaaS" is a reference to "Software-as-a-Service," described in the Agreement as a "business model whereby customers receive a simple-to-understand invoice for each billing period" and that, unlike "traditional" licensing, "keeps the rates firm and fixed."  (See id. Ex. B at 5.)

1    errors and failures within Tachyus's software, and, to each, Tachyus engineers would

2    reply that they would look into the issue, but never once corrected any of the issues or

3    failures" (see FAC ¶ 75).

4        Crescent Point also alleges that, although "the parties never progressed past the

5    Backtesting Phase" (see FAC ¶ 80) and Tachyus had "not shown any feasible

6    opportunities for meaningful financial upside for Crescent Point" (see FAC ¶ 82),

7    Tachyus, in July 2018, "invoiced Crescent Point for $1,050,000," i.e., the fee for the first

8    seven months (see id.).  Crescent Point further alleges that, "in or around September

9    2018," it paid the invoice "due to an administrative error" (see id.), and, in September

10   2018, "notified Tachyus that it was putting the project on hold and ceasing efforts under

11   the Backtesting Phase (Phase I) until further notice" (see FAC ¶¶ 85-86).  Additionally,

12   Crescent Point alleges that although, in February 2019, it advised Tachyus of Tachyus's

13   "breaches" (see FAC ¶ 88), and, in July 2019, it "provided further written notice that

14   Tachyus was in breach" (see FAC ¶ 90), Tachyus took "no steps to deliver Crescent

15   Point a workable software or to otherwise cure any of the breaches that Crescent Point

16   identified" (see FAC ¶ 98).

17       Based on the above allegations, Crescent Point asserts five Causes of Action,

18   titled, respectively, "Fraud in the Inducement," "Breach of Written Contract," "Breach of

19   the Duty of Good Faith and Fair Dealing," "Unfair Competition (Cal. Bus. & Prof. Code

20   § 17200) – Fraudulent and Unfair Business Practices," and "Unjust Enrichment."

21                                    **LEGAL STANDARD**

22       Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be

23   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

24   under a cognizable legal theory."  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696,

25   699 (9th Cir. 1990).  Rule 8(a)(2), however, "requires only 'a short and plain statement of

26   the claim showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v.

27   Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a

28   complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

United States District Court
Northern District of California

1   allegations." <u>See</u> <u>id.</u>  Nonetheless, "a plaintiff's obligation to provide the grounds of his

2   entitlement to relief requires more than labels and conclusions, and a formulaic recitation

3   of the elements of a cause of action will not do." <u>See</u> <u>id.</u> (internal quotation, citation, and

4   alteration omitted).

5        In analyzing a motion to dismiss, a district court must accept as true all material

6   allegations in the complaint and construe them in the light most favorable to the

7   nonmoving party. <u>See</u> <u>NL Indus., Inc. v. Kaplan</u>, 792 F.2d 896, 898 (9th Cir. 1986).  "To

8   survive a motion to dismiss, a complaint must contain sufficient factual material, accepted

9   as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S.

10  662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).  "Factual allegations must be

11  enough to raise a right to relief above the speculative level[.]" <u>Twombly</u>, 550 U.S. at 555.

12  Courts "are not bound to accept as true a legal conclusion couched as a factual

13  allegation." <u>See</u> <u>Iqbal</u>, 556 U.S. at 678 (internal quotation and citation omitted).

**DISCUSSION**

15       By order filed April 13, 2021, the Court granted Tachyus's motion to dismiss the

16  initial complaint and dismissed that pleading with leave to amend.  Crescent Point

17  subsequently filed its FAC, which, by the instant motion, Tachyus contends is subject to

18  dismissal.  The Court considers in turn the five Causes of Action alleged in the FAC.

19  **A.  First Cause of Action**

20       In the First Cause of Action, titled "Fraud in the Inducement," Crescent Point

21  alleges it entered into the Agreement in reliance on twelve assertedly false statements

22  made by Tachyus prior to the date on which the Agreement was executed.

23       Under California law,[4] "[a]n action for promissory fraud may lie where a defendant

24  fraudulently induces the plaintiff to enter into a contract." <u>See</u> <u>Lazar v. Superior Court</u>, 12

25  Cal. 4th 631, 638 (1996).  To support such a claim, the plaintiff must allege that "the

26  defendant knowingly made a false statement," that "the defendant thereby intended to

27  _____

28       [4] The parties agree California law governs Crescent Point's claims.

waterflooding, the injection rates and speeds it used, and how Crescent Point could

maximize oil extraction on its reservoirs."  (See FAC ¶ 31.)

As Tachyus points out, however, the Case Study includes no such statement.

Although Crescent Point, in its opposition, argues that Rule 9(b) does not prohibit a party

from "paraphras[ing]" a statement alleged to be false (see Pl.'s Opp. at 21-22), the Ninth

Circuit requires a plaintiff alleging fraud to allege the "specific content of the false

representations," see Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal

quotation and citation omitted), and, consistent therewith, district courts have found

allegations "paraphras[ing]" statements asserted to be false "lack the specificity required

by Rule 9(b)," see Wenger v. Lumisys, Inc., 2 Fed. Supp. 2nd 1231, 1246-47 (N.D. Cal.

1998) (finding "impressionistic approach to pleading fraud deficient"); see also Gross v.

Symantec Corp., 2012 WL 3116158, at *3-5 (N.D. Cal. July 31, 2012) (holding fraud

claims subject to dismissal where plaintiff paraphrased statements allegedly located on

defendant's website; finding resolution of plaintiff's claims "turn[ed] on how [defendant's]

representations compare[d] to the actual functionality of its software" and complaint failed

to identify what defendant "actually said regarding the functional capabilities of its

software" (emphasis in original)).

Moreover, even if, in some circumstances, a plaintiff's paraphrasing of an allegedly

false statement might comply with the specificity requirement set forth in Rule 9(b), in the

instant case, Crescent Point's allegations fail to provide Tachyus with the requisite notice

of what it characterizes as "False Statement #1."  The Case Study makes no reference to

Crescent Point; rather, it generally describes in its first three pages Tachyus's Data

Physics software product, and then sets forth in the next three pages specific results

achieved by clients who used Tachyus's software, followed by a short conclusion section

in its last, the seventh, page.  (See Richmann Decl. Ex. J.)  None of the statements,

whether providing general descriptions of Tachyus's services or particular results

achieved by users, are at all similar to "False Statement #1"; indeed, the Case Study

does not use in any manner the terms "machine learning, "pressure," "waterflooding," or

United States District Court
Northern District of California

1    "injection rates."

2          Accordingly, to the extent the First Cause of Action is based on "False Statement

3    #1," the claim is subject to dismissal.

4                    **b.  "False Statement #2"**

5          Crescent Point alleges the Case Study "guaranteed that Tachyus's software could

6    complete fieldwide 15-year, 1,000 well forecasts for Crescent Point in less than fifteen

7    minutes.  (See FAC ¶ 33.)

8          As noted, the Case Study makes no reference to Crescent Point.  The language in

9    the Case Study on which Crescent Point apparently relies, however, is the fourth

10   sentence in the first paragraph of the Case Study, which paragraph states as follows:

11         Tachyus Data Physics™ software empowers engineers to quantitatively
       optimize their reservoir injection plans.  The fundamental advantage of
12     Tachyus is the speed at which engineers can create forecasts using Data
       Physics' patent-pending, modeling technology.  Data Physics modeling is a
13     physics-based modeling technique that honors mass and energy balances
       by solving the governing fluid flow equations with a modified neural
14     network.  As a consequence, Data Physics models can produce full-field,
       15 year, 1000 well forecasts in 15 minutes.  Data Physics models combined
15     with patent-pending Metamodel Assisted Memetic Algorithms enable users
       to generate thousands of operational scenarios and find the pareto efficient
16     strategy for optimizing their chosen objectives.

17   (See Richmann Decl. Ex. J at 1.)

18         Crescent Point's claim is dependent on the theory that the fourth sentence in the

19   above-quoted paragraph is, in Crescent Point's words, a "guarantee[ ]" that Crescent

20   Point would obtain the type of forecasts Tachyus describes therein.  The Case Study,

21   however, also states on the same page that Tachyus's contracts with its clients are "split

22   into two phases," that during the first phase, the "Setup" phase, Tachyus, inter alia,

23   "tun[es] initial models," and that if, at the end of the first phase, "predictivity cannot be

24   demonstrated," the "customer has no commitment to continue."  (See id.)  In other words,

25   the Case Study expressly discloses that some customers may not experience

26   "predictivity" from use of Data Physics models.  Under such circumstances, Crescent

27   Point has failed to allege sufficient facts to support a finding that the challenged

28   statement was false.

1   Accordingly, to the extent the First Cause of Action is based on "False Statement

2   #2," the claim is subject to dismissal.

3       **c.  "False Statement #3"**

4   Crescent Point alleges the Case Study "stated that the 'fundamental advantage of

5   the Tachyus technology is the speed at which engineers can create forecasts using Data

6   Physics' patent-pending, modeling technology,' promising that its model 'require[s] only

7   days to set up' and 'offer[s] long-term predictive capacity even when historical data is

8   sparse or missing.'"  (See FAC ¶ 35 (alterations in FAC).)

9   The first of the three quoted statements comprising "False Statement #3" is

10  included in the Case Study, i.e., the statement that "[t]he fundamental advantage of the

11  Tachyus technology is the speed at which engineers can create forecasts using Data

12  Physics' patent-pending, modeling technology."  (See Richmann Decl. Ex. J at 1.)  As

13  Crescent Point does not allege Data Physics cannot create forecasts, its claim of falsity

14  appears to be based on Tachyus's use of the word "speed."  Even assuming the above-

15  quoted statement reasonably can be understood as a promise that all engineers can

16  quickly create forecasts using Data Physics, however, Crescent Point fails to sufficiently

17  allege facts to support a finding that the statement was false when made.  Although

18  Crescent Point alleges that "it took the Parties over four months – longer than the entirety

19  of the promised Backtesting Phase – just to get Crescent Point's data transferred to

20  Tachyus," it does not allege any facts to support a finding that Tachyus never intended to

21  provide results at greater speed.  See Conrad, 45 Cal. App. 4th at 157 (holding "claim of

22  fraud based upon the alleged failure to perform a promise" requires showing "promisor

23  did not intend to perform at the time the promise was made"); Riverisland Cold Storage,

24  Inc. v. Fresno-Madera Production Credit Ass'n, 55 Cal. 4th 1169, 1183 (2013) (holding

25  "intent element of promissory fraud entails more than proof of an unkept promise or mere

26  failure of performance").

27  With respect to the remaining statements comprising "False Statement #3," i.e.,

28  the second and third quoted statements, those statements, as Tachyus points out, do not

United States District Court
Northern District of California

United States District Court
Northern District of California

1   appear in the Case Study.  Nor, to the extent Crescent Point contends in its opposition it

2   has paraphrased statements in the Case Study, has Crescent Point identified the portion

3   or portions of the Case Study it is paraphrasing, and it is not evident from the Case Study

4   what statement(s) therein Crescent Point is attempting to paraphrase.  Indeed, the Case

5   Study states that the "Setup" phase "span[s] four months" (see Richmann Decl. Ex. J at

6   1), not "only days" as Crescent Point appears to claim the Case Study stated, and the

7   Case Study does not use in any manner the terms "long-term predictive capacity" or

8   "historical data."

9          Accordingly, to the extent the First Cause of Action is based on "False Statement

10   #3," the claim is subject to dismissal.

11                  **d.  "False Statement #5"**

12          Crescent Point alleges the Case Study "stated that Tachyus's Data Physics

13   software, when fed with a large sample set of data, would learn how to match previous

14   historical data and then forecast future production based on optimized operating

15   conditions by deploying its 'closed-loop system,'" and that it "described Tachyus's closed-

16   loop system as an automatic, self-sufficient optimizer and predictor that can develop

17   suggestive and informative waterflooding operations with little historical data and validate

18   predictive capacity by continuously 'ingest[ing] new data [such that] the updated models

19   optimize reservoir management decisions such as injection redistribution, in real time

20   throughout the life of the [oil] field."  (See FAC ¶ 39 (alterations in FAC).)

21          As Tachyus again points out, the Case Study does not include the above-quoted

22   language.  Although Crescent Point again contends Rule 9(b) allows it to paraphrase

23   statements, "False Statement #5" fails to sufficiently identify the actual statement on

24   which Crescent Point relies.  Indeed, the Case Study does not use, in any manner, the

25   phrases "fed with a large sample set of data," "historical data," "optimized operating

26   conditions," "waterflooding operations," "ingesting new data," "optimize reservoir

27   management decisions," or "injection redistribution," nor does it describe Tachyus's

28   "closed-loop system" as "an automatic, self-sufficient optimizer."

1    Accordingly, to the extent the First Cause of Action is based on "False Statement

2    #5," the claim is subject to dismissal.

3        **e.  "False Statement #6"**

4    Crescent Point alleges the Case Study "represented that Tachyus's software

5    required very little customer intervention in order to work successfully, and that even

6    during the more intensive setup phase of the software development process, customers

7    only needed to provide 'as little as 3 man hours/week' to get the software up and

8    running."  (See FAC ¶ 43.)

9    As Tachyus points out, with the exception of the phrase "as little as 3 man

10   hours/week," the other language comprising "False Statement #6" is not included in the

11   Case Study; indeed, the Case Study makes no reference to the amount of "customer

12   intervention" required, and, consequently, Crescent Point has, to that extent, failed to

13   identify a false statement.  With regard to the phrase "as little as 3 man hours/week," the

14   Case Study states: "Customer time during [the Setup] phase <u>can be</u> as little as 3 man

15   hours/week <u>depending on the environment</u>" (see Richmann Decl. Ex. J at 1 (emphasis

16   added)); the Case Study does not state that all customers will need to provide only 3 man

17   hours per week.

18   Accordingly, to the extent the First Cause of Action is based on "False Statement

19   #6," the claim is subject to dismissal.

20       **f.  "False Statement #7**

21   Crescent Point alleges that the Case Study includes a statement by Tachyus

22   "representing that its Data Physics software allowed for 'rapid adoption with minimal time

23   and IT investment' by the customer."  (See FAC ¶ 45.)

24   The statement on which Crescent Point relies is set forth in the "Conclusion"

25   section of the Case Study, which section reads, in full:

26       Tachyus software has a proven track record of empowering operators to
         maximize the value of their fields through quantitative optimization.  The
27       simple contracting structure and intuitive user interface allows for rapid
         adoption with minimal time and IT investment, while ensuring sustainability
28       and adoption into existing workflows.

United States District Court
Northern District of California

10

1  (See Richmann Ex. J at 7.)

2       Tachyus argues Crescent Point fails to allege facts to support a finding that the

3  above-quoted statement was false.  As set forth below, the Court agrees.

4       Crescent Point first alleges the statement was false for the reason that, on the

5  date Tachyus sent the Case Study to Crescent Point, Tachyus's software "was still in the

6  beta testing phase of its product development process and did not have a workable

7  product on which to base this claim."  (See FAC ¶ 46.)  The Case Study, however,

8  discloses the basis for its reference to "proven track record," namely, results obtained by

9  clients who has used the software in connection with, respectively, "a mature field" (see

10  Richmann Decl. Ex. J at 4), "an immature thermal field" (see id. Ex. J at 5), and "a

11  middle-of-life thermal field" (see id. Ex. J at 6), and Crescent Point does not allege those

12  clients did not obtain the results set forth in the Case Study.

13       Crescent Point next alleges the statement was false because, according to

14  Crescent Point, Tachyus "was well aware" that Crescent Point's "waterflooding scenarios

15  were complex" and that "transmitting and uploading" Crescent Point's data into Tachyus's

16  software "could cause the software to crash."  (See FAC ¶ 46.)  As discussed above with

17  respect to "False Statement #2," however, the Case Study states Tachyus's contracts

18  have "two phases," the first of which is the "Setup period," and that, after the conclusion

19  of the Setup period, "the customer has no commitment to continue" if "predictivity cannot

20  be demonstrated at the end of Phase 1" (see Richmann Decl. Ex. J at 1).  In other words,

21  the Case Study cannot be understood as stating that all users would obtain the same

22  type of results as those obtained by the clients discussed in the Case Study, and, indeed,

23  it indicates that some users may not.

24       Accordingly, to the extent the First Cause of Action is based on "False Statement

25  #7," the claim is subject to dismissal.

26            **g. "False Statement #10"**

27       Crescent Point alleges the Case Study "claimed that Tachyus's Data Physics

28  software enabled engineers to beat their baseline forecasts by ~30% and their best case

11

1  by ~20%."  (See FAC ¶ 54.)

2          The statement in the Case Study on which Crescent Point relies is contained on a

3  page setting forth the results one client experienced when using Tachyus's software in

4  "managing an immature thermal field."  (See Richmann Ex. J at 5.)  In particular, the

5  Case Study states, with respect to that client, "Tachyus software enabled engineers to

6  beat their baseline forecast by ~30%, and their best case by ~20%, generating $7.5MM

7  in annual profit increases."  (See id.)

8          Crescent Point fails to allege any facts to support a finding that the actual

9  statement made, i.e., the results one client experienced when using Tachyus's software

10  in managing an immature thermal field, was false.  Although Crescent Point alleges

11  Tachyus knew its software "would never provide" those results for Crescent Point (see

12  FAC ¶ 55), the statement on which it relies does not assert all customers will experience

13  those results.[6]

14          Accordingly, to the extent the First Cause of Action is based on "False Statement

15  #10," the claim is subject to dismissal.

16              **h.  "False Statement #11"**

17          Crescent Point alleges the Case Study "claimed that Tachyus's Data Physics

18  software could increase its customers' revenue by as much as $60 million per reservoir

19  that deployed the software, and help increase and enhance customers' overall oil

20  production."  (See FAC ¶ 56.)

21          As Tachyus points out, the Case Study includes no such statements.  Although, as

22  noted, the Case Study does set forth the results three clients experienced using

23  Tachyus's software, the Case Study does not state that any of those clients experienced

24  a revenue increase of $60 million, nor does the Case Study otherwise include any

25

26          _____

27          [6] Crescent Point does not allege its wells are located in an "immature thermal field"
    (see Richmann Decl. Ex. J at 5) and, indeed, acknowledges the referenced customer's
28  wells constitute "a completely different species from Crescent Point's 'unconventional'
    wells" (see FAC ¶ 55).

United States District Court
Northern District of California

statements predicting the amount of revenue customers will experience, or include language promising customers' overall oil production will increase.

Accordingly, to the extent the First Cause of Action is based on "False Statement #11," the claim is subject to dismissal.

### 2. Statements Not Contained in "Case Study"

The First Cause of Action is also based on four statements not alleged to be included in the Case Study.

#### a. "False Statement #4"

"False Statement #4," despite such denomination, actually consists of more than one statement.

First, Crescent Point alleges that, "[f]rom on or June 2017," McNamara told Sinclair and other Crescent Point employees that, in Crescent Point's words, "Tachyus's software was capable of analyzing fracking data for Crescent Point as part of its model." (See FAC ¶ 37.) As Tachyus points out, however, the manner in which the actual statements were made, e.g., email, other writing, conversation, is not disclosed. Moreover, the phrase "from on or June 2017" is ambiguous as to the timeframe in which McNamara made the statements Crescent Point seeks to challenge. Consequently, as to the paraphrased statements by McNamara, Crescent Point has failed to comply with Rule 9(b).

Next, Crescent Point alleges that, on June 15, 2017, in an "exchange[ ] [of] correspondence," Mark Henning ("Henning"), "Tachyus's Principal Geologist," asked Crescent Point to "fill out an 'asset details' spreadsheet that he prepared to start understanding the makeup and characteristics of Crescent Point's wells" and that, as part of his request, he asked for "information and data about Crescent Point's fracking operations."  (See id.)  According to Crescent Point, it responded "with the information he had requested," including informing Henning that "Crescent Point's oil fields contain 'tight oil reservoirs,' 'tight rock,' and 'natural fractures, folds and faults,'" and that Henning replied by stating "such assets would be included 'in the initial scope of work proposal.'"

United States District Court
Northern District of California

1   (See id.)  Crescent Point alleges Henning's reply was the equivalent of "holding Tachyus

2   out as being able to assess such data" (see id.), a statement Crescent Point alleges was

3   false.  Tachyus argues the FAC fails to allege Henning's statement was false.  As set

4   forth below, the Court agrees.

5        Although Crescent Point alleges Tachyus, as of June 15, 2017, "had not even

6   tried" to "incorporate fracking data into its model" and did not add a "fracture closure

7   parameter" to its software until several months after the parties had entered into the

8   Agreement (see FAC ¶ 38), Crescent Point does not allege Henning or any other

9   Tachyus employee told Crescent Point, on June 15, 2017, or at any other point prior to

10  the parties' entering into the Agreement, that Tachyus's software had the then-present

11  ability to incorporate fracking data.  Indeed, the first phase of the Agreement required

12  Tachyus to "[a]cquire data in order to train the models" (see Richmann Decl. Ex. B at 6),

13  an activity that was not to begin until after the parties' entered into the Agreement.

14       Accordingly, to the extent the First Cause of Action is based on "False Statement

15  #4," the claim is subject to dismissal.

16       **b.  "False Statement #8"**

17       "False Statement #8," like "False Statement #4," consists of multiple statements,

18  in this instance, two statements pertaining to the then-proposed contract being "risk free."

19  (See FAC ¶ 47.)  First, according to Crescent Point, McNamara, on May 26, 2017, told

20  Crescent Point "the backtest really is a risk free exercise for CPG [Crescent Point] in that

21  if [Tachyus was] not able to define optimization opportunities [it would] not proceed."

22  (See id. (alterations in FAC).)[7]  Second, Crescent Point alleges, that McNamara, in an

23  October 19, 2017, email to Sinclair, stated:  "If for some reason there are NOT sufficient

24  opportunities to create value, we will walk away.  This is why we term this 'risk free'."

25  (See id. (emphasis in FAC).)  Tachyus argues Crescent Point fails to allege facts to

26

27       _____

28        [7] Crescent Point does not identify the individual to whom McNamara made such
         statement or the type of writing in which it was conveyed.

1  support a finding that the statements comprising "False Statement #8" were false.  The

2  Court agrees.

3          The terms of the Agreement provide, consistent with McNamara's statements,

4  that, "[i]f Backtest results do not provide feasible opportunities for meaningful financial

5  upside for Crescent Point, Crescent Point, at its sole discretion, may terminate this

6  [Agreement] without paying the Early Termination Fee" and that Tachyus would send

7  "[n]o invoice if Backtest results provide no feasible opportunities."  (See Richmann Decl.

8  Ex. B at 10.)  Although Crescent Point alleges Tachyus "improperly charg[ed] Crescent

9  Point for its time" (see FAC ¶ 48), an apparent reference to the invoice Tachyus sent

10 Crescent Point and that Crescent Point allegedly paid in "error" (see FAC ¶ 82), the

11 improper issuing of an invoice, standing alone, is insufficient to establish fraud, see

12 Tenzer v. Superscope, Inc., 39 Cal. 3d 18, 30 (1985) (holding "proof that a promise was

13 made and that it was not fulfilled" is insufficient to establish fraud).

14         Accordingly, to the extent the First Cause of Action is based on "False Statement

15 #8," the claim is subject to dismissal.

16                        **c.  "False Statement #9"**

17         Crescent Point alleges that, on April 25, 2017, McNamara sent an email to Sinclair

18 and another Crescent Point employee, in which McNamara stated Tachyus's software

19 "could 'automatic[ally] incorporate[e] log data' into the software to enhance 'multi-

20 objective optimization techniques.'"  (See FAC ¶ 50 (alterations in FAC).)

21         In support of falsity, the only non-conclusory allegation Crescent Point makes is

22 that, after the parties began performing under the Agreement, Tachyus's software "failed

23 to store, let alone incorporate or model, any results based on Crescent Point's data" (see

24 FAC ¶ 51), an allegation that is insufficient to support a finding that the statement was

25 false when made, see Tenzer, 39 Cal. 3d at 30.

26         Accordingly, to the extent the First Cause of Action is based on "False Statement

27 #9," the claim is subject to dismissal.

28 //

United States District Court
Northern District of California

#### d.  "False Statement #12"

Crescent Point alleges that, on October 18, 2017, Dakin Sloss ("Sloss"), Tachyus's "co-founder," sent an email to Ryan Girtzfeldt, a Crescent Point employee, in which Sloss stated he was "'confident that using Tachyus at CPG [Crescent Point]' would 'unlock significant production increases and cost reductions in [Crescent Point's] water floods.'" (See FAC ¶ 58 (alterations in FAC).)

Crescent Point alleges Sloss's statement was false when made for the reasons that (1) Tachyus's software had not been "designed to work on horizontal wells or in tight reservoirs," (2) prior to October 18, 2017, the software had not been "tested or modeled on such wells," and (3) that, up to October 18, 2017, Tachyus had "only worked with eight customers before Crescent Point," each of which "had operations that drastically differed from Crescent Point's operations."  (See FAC ¶ 59.)  Such allegations, however, do no more than support an inference that Sloss was aware Crescent Point's operations differed from Tachyus's then-existing customers' operations, not an inference that Sloss believed Crescent Point would not obtain from the software the benefits he identified in the above-referenced email.

Accordingly, to the extent the First Cause of Action is based on "False Statement #12," the claim is subject to dismissal.

#### 3. Conclusion as to First Cause of Action

For the reasons stated above, the First Cause of Action is, in its entirety, subject to dismissal.

### B.  Second Cause of Action

In the Second Cause of Action, titled "Breach of Written Contract," Crescent Point alleges Tachyus failed to comply with five provisions in the Agreement.

At the outset, Tachyus reasserts an argument made in support of dismissal of the initial complaint, namely, that Crescent Point cannot bring a claim for breach of contract because, prior to filing suit, it did not comply with the terms of a "Termination" provision in the Agreement.  In responding to the motion to dismiss the initial complaint, Crescent

United States District Court
Northern District of California

1   Point did not challenge Tachyus's argument that noncompliance with such provision

2   constitutes a bar to suit, and, consequently, the Court did not at that time consider what

3   effect, if any, the Termination provision had on Crescent Point's ability to bring a claim for

4   breach of contract.[8]

5       In opposing the instant motion, Crescent Point now contends any failure on its part

6   to comply with the Termination provision is not a bar to bringing a claim for breach of

7   contract.  Consequently, the Court now considers that question.

8       The Termination provision reads as follows:

9       Either Party may, at its option, terminate this Agreement in the event of a
        material breach by the other Party . . . .  Such termination may be effected
10      only through a written notice to the breaching party, specifically identifying
        the breach or breaches on which such notice of termination is based.  The
11      breaching party will have a right to cure such breach or breaches within
        thirty (30) days of receipt of such notice, and this Agreement will terminate
12      in the event that such cure is not made within such thirty (30)-day period.

13  (See Richmann Decl. Ex. A ¶ 9.2.)

14      The above provision, as one district court, in considering a substantially similar

15  provision, notes, "allows [a] party to terminate the agreement early due to material breach

16  if the terminating party provides notice and an opportunity to cure," but does not

17  "mention[ ] any obligation to provide notice or an opportunity to cure prior to bringing

18  suit," or, "[i]n fact . . . refer to bringing suit at all."  See Advanced Thermal Sciences Corp.

19  v. Applied Materials Inc., 2008 WL 11338614, at 2 (C.D. Cal. July 1, 2008).  Under such

20  circumstances, the Court agrees that "the 'Termination' provision applies when one party

21  is seeking to terminate the Agreement because of alleged breach, but does not apply to

22  bringing suit for the alleged breach," see id. (emphasis in original),[9] and, consequently,

23

24  _____

    [8] In opposing the initial motion to dismiss, Crescent Point argued that it complied
25  with the Termination provision, an argument the Court did not find persuasive.

26      [9] The authority cited by Tachyus, Tamayo v. Gruma Corp., 2015 WL 5734873
    (E.D. Cal. September 29, 2015), is not to the contrary, as the district court therein did not
27  consider whether a failure to comply with a termination provision constituted a bar to a
    plaintiff's bringing a claim for breach of contract.  Rather, the district court considered
28  whether the plaintiff had alleged sufficient facts to support its claim that the defendant
    breached the contract by terminating the agreement after the plaintiff had timely cured an

1  finds any failure by Crescent Point to comply with the Termination provision does not bar

2  the filing of a lawsuit for breach of contract.  Cf. Gerber v. First Horizon Home Loans

3  Corp., 2006 WL 581082, at *1-2 (W. D. Wash. March 8, 2006) (dismissing claim for

4  breach of contract where plaintiff did not afford defendant opportunity to cure and

5  contract provided neither party "may commence . . . any judicial proceeding until such

6  [party] has notified the other party . . . and afforded the other party hereto a reasonable

7  period after the giving of such notice to take corrective action").  The Court next considers

8  the merits of Crescent Point's claim.

9  **1.  Provision Requiring Service "Be Free of Any Defects"**

10  Section 6.1 of the Master Subscription Agreement ("MSA"), one of the three

11  documents comprising the parties' Agreement, provides:  "[T]he Tachyus Service shall

12  . . . strictly comply with all applicable specifications, descriptions, and other conditions of

13  this Agreement and any Statement of Work and be free of any defects."  (See Richmann

14  Decl. Ex. A ¶ 6.1.)

15  Crescent Point alleges Tachyus "never provided a software that was 'free of any

16  defects'" (see FAC ¶ 151), in that, according to Crescent Point, during the first phase,

17  Tachyus's software "continuously failed to provide any sort of predictive capacity" (see

18  FAC ¶ 149), was not "a workable product at any point in time" (see FAC ¶ 150), and

19  provided "backtesting results" that were "nonsensical" and "flawed" (see FAC ¶¶ 151-52).

20  Additionally, Crescent Point alleges that, shortly before the deadline to complete the first

21  phase, Tachyus was "nowhere near ready to provide a software model that showed

22  'feasible opportunity for meaningful financial upside'" (see FAC ¶ 152), and, ultimately,

23  that the parties "never progressed" beyond the first phase (see FAC ¶¶ 79-80).

24  As Tachyus points out, the above-cited section, contrary to Crescent Point's

25  allegation (see FAC ¶ 148), does not obligate Tachyus to provide a product "free of any

26  defects" (see id.).  Indeed, the MSA contains a "Disclaimer" that expressly contemplates

27  _____

28  asserted failure to perform.  See id. at *4.

United States District Court
Northern District of California

United States District Court
Northern District of California

a situation where Tachyus's software might produce errors that would not be "corrected" and would not produce results satisfactory to Crescent Point.  (See Richmann Decl. Ex. A ¶ 6.2 (providing "Tachyus does not warrant that the Tachyus Service will meet customer's requirements or that the operation of the Tachyus Service will be uninterrupted or error-free, or that all errors will be corrected").)  Consequently, the term "free of any defects," as used in ¶ 6.1 of the MSA, cannot reasonably be interpreted to mean that the software would be free of imperfection or would produce results financially beneficial to Crescent Point.  Indeed, the Agreement provides that, during the first phase, Tachyus was to complete a "Backtest" and then "present to Crescent Point the opportunities for optimization," and if there were none, Crescent Point was allowed to terminate the Agreement without making any payment to Tachyus (see id. Ex. B at 10 (providing Crescent Point with right to terminate without payment if "Backtest results [did] not provide feasible opportunities for meaning financial upside for Crescent Point"); see also id. (prohibiting Tachyus from issuing "invoice" if "Backtest results provide no feasible opportunities")), thus expressly contemplating a situation where the software might not produce results satisfactory to Crescent Point.

Accordingly, to the extent the Second Cause of Action is based on Tachyus's alleged failure to comply with ¶ 6.1 in the MSA, the claim is subject to dismissal.

**2.  Provision Requiring "Tour"**

The Statement of Work ("SOW"), another of the three documents comprising the Agreement, identifies five "activities" that were required during the initial part of the first phase, one of which is:  "Tour field to understand operational constraints and field operator perspective.  (See id. Ex. B at 6.)[10]

Crescent Point alleges Tachyus failed to comply with such obligation, in that it "failed to tour Crescent Point's wells" and "failed to do any of its own diligence on the

---

[10] The SOW identifies the fields as "the Viewfield, Leitchville[,] and Cantaur fields located in the province of Saskatchewan."  (See id. Ex. B at 10.)

1    unique features of Crescent Point's operations."  (See FAC ¶ 63.)  Although Tachyus

2    contends "the only conclusion to be draw from [the FAC] is that Crescent Point concluded

3    that a site visit was unnecessary" (see Def.'s Mot. at 16:5-6), no such conclusion is

4    apparent from the FAC, and any defense based on such contention is premature at the

5    pleading stage.

6        Accordingly, to the extent the Second Cause of Action is based on Tachyus's

7    alleged failure to tour Crescent Point's oil fields during the first phase of the parties'

8    Agreement, the claim is not subject to dismissal.

9        **3.  Provision Requiring "Qualified" Personnel**

10       The SOW, in a section titled "Key Personnel," provides as follows:

11       Tachyus shall supply personnel who are qualified to perform the services
         and Work, including Jeff McNamara ("Key Personnel").  Tachyus shall not
12       remove, reassign or replace any Key Personnel in connection with the Work
         without Crescent Point's prior written consent, unless the engagement of
13       any Key Personnel with Tachyus has been terminated, in which case
         Tachyus shall promptly replace such Key Personnel with other personnel
14       approved by Crescent Point, who thereafter shall be deemed to be Key
         Personnel.

15

16   (See Richmann Decl. Ex. B at 8-9.)

17       Crescent Point alleges Tachyus breached the above-quoted provision "by failing to

18   supply personnel qualified to perform the services and work related to developing the

19   Tachyus software for Crescent Point."  (See FAC ¶ 155.)  In support of such claim,

20   Crescent Point alleges that the "key personnel Tachyus supplied, such as [Garrett]

21   Fowler and [Ken] Lawrence, were incapable of modeling Tachyus's software for tight oil

22   reservoirs, . . . [n]or did anyone else on Tachyus's team have any of the requisite skills

23   and experience to be able to interpret and model data for Crescent Point's use."  (See

24   FAC ¶ 156; see also FAC ¶ 158 (alleging Tachyus "outsource[ed] . . . backtesting work to

25   'offshore' third-party engineers who were unfamiliar with Crescent Point's unique tight oil

26   reservoirs"); FAC ¶ 162 (alleging Tachyus failed to provide competent engineers,

27   "whether outsourced or not").)

28       As an example, Crescent Point alleges that, at a meeting held in July 2018, i.e.,

20

six months after the parties began performing under the contract, one of Tachyus's "key personnel" showed Crescent Point "results from its model that suggested Crescent Point use significantly less water production to increase oil extraction," referred to such results as a "'success' for Tachyus's software model" (see FAC ¶¶ 156-57), and, based thereon, made a "recommendation" that Crescent Point "inject significantly less water into the wells than current levels of water injection" (see FAC ¶ 68).  According to Crescent Point, advising such use of significantly less water would have been understood as "clearly erroneous" to anyone with "a basic understanding of tight oil production" (see FAC ¶ 157), such advice being "illogical when applied to tight reservoirs" (see FAC ¶ 68). Additionally, Crescent Point alleges that, when Crescent Point's "engineers would point out errors and failures within Tachyus's software," Tachyus's engineers "would reply that they would look into the issue, but never once corrected any of the issues or failures that Crescent Point identified."  (See FAC ¶ 75; see also FAC ¶¶ 70-74 (identifying allegedly erroneous information provided to Crescent Point by Tachyus).)

In seeking dismissal, Tachyus points out that "[g]etting a fact wrong at a meeting" does not mean that an employee is "unqualified."  (See Def.'s Mot. at 16:2-3.)  Given Crescent Point's allegation, however, that the erroneous advice would not have been offered by a person possessing "[e]ven a basic understanding" of the type of oil extraction in which Crescent Point engages (see FAC ¶ 157), as well as its allegations that such error was "not an isolated incident" (see FAC ¶¶ 68-69; see also FAC ¶ 70-74), the Court finds the claim is not subject to dismissal.

Accordingly, to the extent the Second Cause of Action is based on Tachyus's alleged failure to provide qualified personnel, the claim is not subject to dismissal.

### 4.  "No Invoice" Provision

The SOW provides that Crescent Point would not be billed the monthly fee for use of Tachyus's software during the "Setup Phase" and, instead, that Crescent Point would be "invoiced at end of Backtest for entire phase."  (See Richmann Ex. B at 10.)  The SOW further states:  "No invoice if Backtest results provide no feasible opportunities."

United States District Court
Northern District of California

1   (See id.)  As set forth above, Crescent Point alleges that, although "the parties never

2   progressed past the Backtesting Phase" and Tachyus had "not shown any feasible

3   opportunities for meaningful financial upside for Crescent Point," Tachyus, in July 2018,

4   sent Crescent Point an invoice in the amount of $1,050,000, i.e., the fee for the first

5   seven months, and that Crescent Point, approximately two months later, paid the invoice

6   "due to an administrative error."  (See FAC ¶¶ 80, 82.)

7        In seeking dismissal, Tachyus relies on a provision in the Agreement stating

8   payments are non-refundable.[11]  The provision on which Tachyus relies states that the

9   "[c]ustomer will pay to Tachyus all fees in accordance with the relevant Statement of

10   Work," that "[p]ayment obligations are non-cancelable," and, "except as expressly

11   provided in [the] Agreement, all payments made are non-refundable."  (See Richmann

12   Decl. Ex. A ¶ 4.1.)  Given Crescent Point's allegation that the Backtest results "had not

13   shown any feasible opportunities" for Crescent Point (see FAC ¶ 82), however, and,

14   assuming, as the Court must, such factual allegation is true, Crescent Point owed no fee

15   under the relevant SOW and Tachyus, in turn, was contractually prohibited from sending

16   Crescent Point an invoice, (see Richmann Decl. Ex. A ¶ 4.1, Ex. B at 10).

17        Accordingly, to the extent the Second Cause of Action is based on Tachyus's

18   sending an invoice, the claim is not subject to dismissal.

19        **5. "Mutual Confidentiality Obligations" Provision**

20        Under the MSA, "data and/or content posted, transmitted, displayed, submitted,

21   generated, uploaded or otherwise made available to Tachyus through [Crescent Point's]

22   use of the Tachyus Service" is deemed "Confidential Information."  (See id. Ex. A ¶¶ 1,

23   5.3.)  Additionally, under the MSA, in a section titled "Mutual Confidentiality Obligations,"

24   a party who "receiv[es]" Confidential Information "shall . . . at the disclosing Party's

25   election, destroy or return to the other Party any tangible copies of the Confidential

26

27        [11] Tachyus also contends Crescent Point did not pay the invoice in error, a factual

28   argument that is premature at the pleading stage.

1    Information and permanently delete all electronic copies of the Confidential Information in

2    its possession or control and will certify in writing to the disclosing Party that it completed

3    the foregoing."  (See id. Ex.  A ¶ 5.2)

4          Crescent Point alleges that, in a letter dated July 9, 2019, it "sought the return" of

5    its "well and field data" and that Tachyus "failed to return" such data (see FAC ¶ 167), a

6    failure that, according to Crescent Point, constituted a breach of the Mutual Confidential

7    Obligations provision quoted above.  In seeking dismissal, Tachyus argues, in essence,

8    that the letter did not include an "election," and, consequently, that Crescent Point has

9    failed to allege facts to support a finding that Tachyus, by not returning the data in

10   response thereto, failed to comply with the Mutual Confidentiality Obligations provision.

11   As set forth below, the Court agrees.

12         According to the FAC, the following events occurred.  On September 10, 2018,

13   and, again on September 13, 2018, Kerry Sandhu, a Crescent Point employee, emailed

14   Tachyus to say Crescent Point had "decided to put the project 'on hold' until Crescent

15   Point and Tachyus could meet to discuss the myriad issues Crescent Point had

16   experienced and to establish a new 'go forward plan'" (see FAC ¶ 86 (emphasis in FAC)),

17   and, after "[s]ubsequent discussions between the [p]arties" (see FAC ¶ 87), Tachyus, on

18   March 6, 2019, sent Crescent Point a "Draft Proposal to Resume Crescent Point

19   Waterflood Optimization," which included Tachyus's proposal to "[u]pdate the existing

20   field backtest model" (see Richmann Decl. Ex. G at 2).[12]  Subsequently, by the above-

21   referenced letter of July 9, 2019, Crescent Point responded by stating it "was not

22   prepared to accept" Tachyus's proposal and, instead, was making a "Counterproposal"

23   that it would "forgo [its] claim" for a return of the $1,050,000 payment in exchange for the

24   following:  "(i) the payment by Tachyus to Crescent Point of $750,000; and (ii) Tachyus's

25   prompt return of all of the data and information previously provided to Tachyus by

26

27         _____

           [12] Tachyus's unopposed request that the Court take judicial notice of Tachyus's
28   letter dated March 6, 2019, is hereby GRANTED.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Crescent Point" (see id. Ex. H at 1),[13] which Counterproposal would "remain open for

2   acceptance by Tachyus until 4:30 p.m. on July 29, 2019" (see id.).  Tachyus did not

3   thereafter respond to the Counterproposal.  (See FAC ¶ 95.)

4       In sum, the only reference to a return of confidential material was contained in a

5   condition of a Counterproposal that was not accepted.  Under such circumstances,

6   Crescent Point fails to plead the requisite election was made.

7       Accordingly, to the extent the Second Cause of Action is based on Tachyus's

8   alleged failure to comply with the Mutual Confidentiality Obligations provision, the claim is

9   subject to dismissal.

10      **6.  Conclusion as to Second Cause of Action**

11      For the reasons stated above, the Second Cause of Action is subject to dismissal

12  to the extent it is based on alleged breaches of the "be free of any defects" and "Mutual

13  Confidentiality Obligations" provisions.  In all other respects, the Second Cause of Action

14  is not subject to dismissal.

15  **C.  Third Cause of Action**

16      The Third Cause of Action is titled "Breach of the Duty of Good Faith and Fair

17  Dealing."

18      Under California law, "the implied covenant imposes upon each party the

19  obligation to do everything that the contract presupposes they will do to accomplish its

20  purpose."  See Careau & Co. v. Security Pacific Business Credit, Inc., 222 Cal.App.3d

21  1371, 1393 (1990) (internal quotations and citation omitted).  "To the extent [an] implied

22  covenant claim," however, "seeks simply to invoke terms to which the parties did agree, it

23  is superfluous," and the plaintiff's "remedy, if any" is to proceed with a breach of contract

24  claim.  See Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 352-53 (2000).

25      Here, in the Third Cause of Action, Crescent Point sets forth a series of allegations

26

27      [13] Tachyus's unopposed request that the Court take judicial notice of Crescent
28  Point's letter dated July 9, 2019, is hereby GRANTED.

that describe Tachyus's failure to comply with its obligations under the Agreement.  (See

FAC ¶¶ 179-89.)  Although Crescent Point puts particular emphasis of its allegation that

Tachyus used Crescent Point's data for the benefit of "future customers" (see, e.g., FAC

¶ 185 (alleging Tachyus "took volumes of Crescent Point's data" and "used such data to

develop improvements and enhancements to Tachyus's software for use with future

customers")), the propriety of any such alleged use of Crescent Point's data is expressly

addressed in the Agreement (see Richmann Decl. Ex. A ¶ 5.2 (providing party receiving

"Confidential Information" shall use it "only as permitted by this Agreement")),[14] and,

consequently, must be challenged, if at all, in a claim based on the breach of an express

term.  See Guz, 24 Cal. 4th at 352-53.

Accordingly, the Third Cause of Action is subject to dismissal.

**D.  Fourth Cause of Action**

In the Fourth Cause of Action, titled "Unfair Competition (Cal. Bus. & Prof. Code

§ 17200) – Fraudulent and Unfair Business Practices," Crescent Point alleges Tachyus

has engaged in unfair business practices.

To the extent the Fourth Cause of Action is based on alleged "fraudulent"

practices (see FAC ¶¶ 197-211), the claim is derivative of the First Cause of Action, and,

consequently, is subject to dismissal for the reasons stated above with respect to the

First Cause of Action.

To the extent the Fourth Cause of Action is based on alleged "unfair" practices

(see FAC ¶¶ 215-31), the claim is subject to dismissal, as it is wholly based on conduct

alleged to be in breach of the parties' Agreement,[15] and § 17200 does not encompass

---

[14] As set forth above, under the MSA, the "data" Crescent Point makes available to Tachyus is deemed "Confidential Information."  (See id. Ex. A ¶¶ 1, 5.3.)

[15] Specifically, Crescent Point alleges the following acts were unfair: (1) Tachyus's "outsourcing work to unqualified 'offshore' engineers for pennies on the dollar" and "never inform[ing] Crescent Point of its outsourcing arrangement" (see FAC ¶¶ 215, 221); and (2) "refus[ing] to return any of Crescent Point's data" and using such data "to further its own commercial goals" (see FAC ¶¶ 229-30).

United States District Court
Northern District of California

1   claims of such nature.  See Linear Technology Corp. v. Applied Materials, Inc., 152 Cal.

2   App. 4th 115, 135 (2007) (holding, "where a [§ 17200] action is based on contracts not

3   involving either the public in general or individual consumers who are parties to the

4   contract, a corporate plaintiff may not rely on [§ 17200] for the relief it seeks"; noting

5   § 17200 "was enacted to protect both consumers and competitors by promoting fair

6   competition in commercial markets for goods and services" (internal quotations and

7   citation omitted)); In re Webkinz Antitrust Litig., 695 F. Supp. 2d 987, 998 (N.D. Cal.

8   2010) (dismissing § 17200 claim where corporate plaintiffs' claim "fundamentally

9   sound[ed] in contract" and failed "to state a connection to the protection of the general

10  public").

11          Accordingly, the Fourth Cause of Action is subject to dismissal in its entirety.

12  **E.  Fifth Cause of Action**

13          In the Fifth Cause of Action, titled "Unjust Enrichment," Crescent Point alleges

14  that, "[d]ue to Tachyus's "fraudulent inducement and fraudulent and unfair business

15  practices," Crescent Point has "grounds to seek rescission of the [p]arties' Agreement"

16  (see FAC ¶ 241), and that, in the event the Agreement is rescinded, Crescent Point is

17  entitled to recover the money and property Tachyus "unjustly" received from it (see FAC

18  ¶ 242).  In other words, the Fifth Cause of Action is derivative of the First and Fourth

19  Causes of Action.

20          Accordingly, as the First and Fourth Causes of Action are subject to dismissal, the

21  Fifth Cause of Action likewise is subject to dismissal.

22                                          **CONCLUSION**

23          For the reasons stated above, Tachyus's motion to dismiss is hereby GRANTED in

24  part and DENIED in part, as follows:

25          1. To the extent Tachyus seeks dismissal of the First, Third, Fourth, and Fifth

26  Causes of Action, the motion is GRANTED.

27          2.  With regard to the Second Cause of Action, the motion is GRANTED to the

28  extent Crescent Point claims Tachyus breached the "be free of any defects" and "Mutual

United States District Court
Northern District of California

Confidentiality Obligations" provisions.

3.  In all other respects, the motion is DENIED.

If Crescent Point wishes to amend for purposes of curing any of the deficiencies identified above, it shall file a Second Amended Complaint no later than February 28, 2022.  Crescent Point may not, however, add any new claims without first obtaining leave of court.  See Fed. R. Civ. P. 15(a)(2).  If Crescent Point does not file a Second Amended Complaint, the instant action will proceed on the remaining claims in the First Amended Complaint.

**IT IS SO ORDERED.**

Dated: February 10, 2022

MAXINE M. CHESNEY
United States District Judge

United States District Court
Northern District of California

27